ST. LOUIS SOUTHWESTERN RAILWAY
COMPANY v. TRUDIE EVANS

73-29                                            497 S.W. 2d 692

Opinion delivered July 2, 1973
[Rehearing denied August 27, 1973.]

*Coleman, Gantt, Ramsay & Cox,* for appellant.

*McMath, Leatherman & Woods,* and *Howard, Howard, Howard,* and *Wilson & Hodge,* for appellee.

LYLE BROWN, Justice. Appellee was seriously injured as a result of a collision between her automobile and appellant's train. Appellee was awarded a substantial judgment, the amount of which is not questioned. Appellant seeks reversal on the grounds that it was error to give AMI 1805 (abnormally dangerous crossing); that the court also erred in giving AMI 1802 (lookout); and that appellant was entitled to an instructed verdict.

Appellee lived approximately one mile on a gravel road from where the road crosses appellant's main line tracks and runs into State Highway 79 on the opposite side of the track. In proximity to the crossing the road curved to appellee's right. At a distance of forty-five feet from the tracks the road becomes perpendicular to the tracks. As she traveled along the road her vision to her right, from whence the train was coming, was somewhat obscured by shrubs and bushes and that condition existed until she reached the forty-five foot point to which we have referred.

Appellee Trudie Evans had worked at a paper mill at Camden for many years. She was a frequent user of the gravel road and was on her way to work at the time of the accident on a clear afternoon. She testified that as she rounded the curve she could not see the railroad tracks looking to her right because of bushes and saplings along the fence rows both beside the gravel road and alongside the railroad right-of-way fence. She said that when she got into the forty-five foot area it was necessary to look over her right shoulder to see a train approaching from that direction. She said that as she approached the track she looked both directions and did not see the train. She said as she looked up and down the track her vision to her right was evidently obscured by the line of bushes. She asserted that she did not see or hear the train until a matter of seconds before she was struck. That is when, she said, she heard the whistle; she said she never heard a bell. Her car windows were rolled up. She said she came to a rolling stop near the edge of the fence line, and not seeing a train, she proceeded to drive across the track very slowly. She said the impact rendered her unconscious.

Landal Evans, son of appellee, testified that he observed the premises around the crossing and that at the time of the accident the trees were budded and had small leaves on them. He testified that the vision of the crossing was obstructed by the growth of briars, vines, and small bushes which were along the side of the road and on the fence row which parallel the tracks.

It was stipulated that an average of 115 cars passed over the crossing in one day and that two school buses crossed it twice daily. It was also shown that the number of trains passing the crossing was 22 per day on a 24 hour basis.

After being denied a motion for directed verdict the appellant presented five witnesses. Locomotive engineer, J. A. Favor, testified that he was positioned on the right side of the engine going south (being the side opposite appellee as she approached the crossing); that fireman Motes and head brakeman Holladay were seated on the left side. "I have a throttle that controls the speed, the brake to regulate it with to stop the train, whistle cord, bell ringer and light switches." He explained that as they approached the crossing there was a straight stretch of some two and a quarter miles and that the train was traveling approximately fifty miles per hour. "As you approach the crossing, there is a whistle board a quarter of a mile from the crossing. When I reached the whistle board as I approached this crossing I turned the bell on at the crossing board signal and started blowing the standard crossing whistle." He testified that he did not see appellee's car until seconds before it was hit. He explained that the engine has a "nose" on it that protrudes some twelve or fifteen feet from the engineer's seat and it obstructed his view as the train came into the crossing. "As I got real close to the crossing the fireman hollered 'look out for the car', and I applied the brakes in emergency. About the time I done that, well, I could see the hood part of the car was about the center of the engine there where I could see." On cross-examination he said he was "within seconds from the crossing" when the fireman warned him of the car, estimating the train to have been within fifteen feet of the crossing.

Fireman T. L. Motes, seated on the left side, testified he saw the car as it approached the crossing; that as appellee approached the crossing it appeared she slackened her speed as if she were going to stop; that as she got closer to the crossing he realized she was not going to stop and he then warned the engineer. He corroborated the engineer with respect to blowing the whistle and ringing the bell. When the train was stopped, this witness went back to the crossing and said he heard appellee moan that her brakes would not work.

Brakeman Louis Holladay, seated on the left and behind the fireman, said he saw appellee's car as it approached the curve and several feet before she reached the forty-five foot mark; that she slowly came up the incline in the road and he thought appellee was going to stop; and because he thought she was stopping the witness gave no warning when he first saw the car. He said the engineer was blowing the whistle and ringing the bell as they approached the crossing.

Witness R. A. Womble, a brakeman on the second engine, was seated on the side opposite appellee. He had no knowledge of the accident before it occured. He went to the scene. He said appellee appeared unconscious but he heard her say her brakes failed.

Rev. James Kile lives in Shreveport and at the time of the accident he was driving alongside the train and in the same direction. It was stipulated that if present he would testify that the train was going approximately 50 miles per hour and that he heard the train whistle blowing for perhaps a quarter of a mile and up until the impact. He did not see the impact. It was also stipulated that there had been no other accident on this crossing for at least the past twenty years, there being no records of the railroad prior to that time. It was also agreed that appellee faced a wooden crossing sign as she approached the crossing and that there were no flasher lights or bars.

POINT I. *The trial court erred in submitting AMI 1805 (abnormally dangerous crossing) to the jury. .*

The instruction reads as follows:

Trudie Evans contends that the railroad grade crossing in this case was abnormally dangerous, and she has the burden of proving this proposition.

If a railroad grade crossing is frequently used by the traveling public, if trains pass over it frequently, and if the crossing is so dangerous because of surrounding circumstances that a reasonably careful person could not use it with reasonable safety in the absence of special warnings, then it would be an abnormally dangerous crossing. Whether the railroad grade crossing in this case was abnormally dangerous is for you to decide.

If you find that the crossing was abnormally dangerous, as I· have defined that term, then it was the duty of the railroad to use ordinary care to give a warning reasonably sufficient to permit the traveling public to use the crossing with reasonable safety.

The instruction is based on our holding in *Fleming* v. *Missouri & Ark. R. Co.*, 198 Ark. 290, 128 S.W. 2d 986 (1939). Appellant forcefully argues that 115 cars and two school buses do not, as a matter of law, constitute "frequent" use by the traveling public.

There are at least three cases in which we have approved the applicability of *Fleming* and in each of those cases the traffic was much heavier than in the case at bar. *Hawkins* v. *Mo. Pac. R.R. Co.*, 217 Ark. 42, 228 S.W. 2d 642 (1950); *St. Louis S.W. Ry. Co.* v. *Farrell*, 242 Ark. 757, 416 S.W. 2d 334 (1967); and *St. Louis S.W. Ry. Co.* v. *Jackson*, 242 Ark. 858, 416 S.W. 2d 273 (1967). We disapproved the application of *Fleming* in a case where the vehicular traffic was minimal and a total of only three trains daily passed the intersection. *Chicago, R.I. & P.R.R. Co.* v. *Gray*, 248 Ark. 640, 453 S.W. 2d 54 (1970).

Calculating on the basis of the flow of vehicular traffic agreed upon, we conclude that the average number of cars passing hourly over the crossing per twenty-four hour day was four plus vehicles. Recognizing that it is difficult to say what constitutes "frequency of use", and

further recognizing that fundamentally it is an issue which addresses itself to the jury, yet we can say with a reasonable degree of certainty that the use of this crossing was not frequent within the contemplation of *Fleming*. Thus we conclude that the instruction should not have been given.

POINT II. *The trial court erred in submitting AMI 1802 (lookout) to the jury.* We see no need to repeat our abstract of the testimony concerning facts here relevant. In *Baldwin* v. *Brim*, 192 Ark. 252, 91 S.W. 2d 255 (1936), we held that before an injured party could make an issuable case for the jury under the lookout statute it was necessary to establish:

". . . first, that the injuries occurred by reason of the operation of a train;

second, that the circumstances surrounding the injuries were such as to reasonably lead to the conclusion that the injuries would not have occurred had a proper lookout been kept; and,

third, had such lookout been kept, the peril of the injured party could have, by the exercise of ordinary care, been discovered in time to have avoided the injury."

AMI (Civil) 1802 provides:

All persons operating trains upon any railroad in this state have the duty to keep a constant lookout for persons upon, near, or approaching the railroad track. A violation of this duty is negligence.

This does not mean that each member of the train crew must keep a constant lookout, but it does mean that an efficient lookout must be kept by some member of the crew at all times.

We think that the lookout kept by the trainmen was sufficient under the circumstances. Their testimony with reference to the approach and decreasing speed of appellee's car corroborated appellee's testimony—she said she continued up the incline at a rolling stop speed

and the fireman and brakeman described it as continuing at a slow walk. Needless to say, under the undisputed evidence, the train could not have been stopped in time to avoid the collision after it became apparent that appellee was not going to make a normal stop.

We cannot distinguish this case from that which was before us in *Missouri Pac. R.R. Co. v. Doyle,* 203 Ark. 1111, 160 S.W. 2d 856 (1942), wherein we reversed and dismissed a judgment against the railroad. In pointing out that no issue had been made under the lookout statute, we said:

". . . The operatives of trains have the right to assume that a traveler or a pedestrian approaching a railroad track will act in response to the dictates of ordinary prudence and the instinct of self-preservation, and will, in fact, stop before placing himself in peril, and the duty of the railroad employees to take precaution begins only when it becomes apparent that the traveler at a crossing will not do so."

AMI (Civil) 602 provides:

Every person using ordinary care has a right to assume, until the contrary is or reasonably should be apparent, that every other person will use ordinary care and obey the law. To act on such assumption is not negligence.

We hold that it was error to submit the issue of lookout. The railroad was entitled to an instructed verdict. The case was fully developed and for that reason we do not remand.

Reversed and dismissed.

HARRIS, C.J., and JONES and HOLT, JJ., would remand rather than dismiss.