Charles PAYNE, Respondent,

v.

**CORNHUSKER MOTOR LINES, INC., Appellant.**

No. ED 84687.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 9, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 29, 2005.

Kevin L. Fritz, Dean A. Stark, St. Louis, MO, for appellant.

Roger Denton, Paul Slocomb, St. Louis, MO, for respondent.

NANNETTE A. BAKER, Judge.

Charles Payne ("Plaintiff"), a train engineer for Union Pacific, was operating a train near Paragould, Arkansas when it collided with a tractor-trailer owned by Cornhusker Motor Lines ("Defendant"). Plaintiff sued for injuries sustained in the accident and a jury awarded him $3,500,000.00 in damages and assessed him to be 15% at fault. The court granted Plaintiff's motion for judgment notwithstanding the verdict ("JNOV") and reversed the jury's comparative fault findings. Defendant appealed.[1]

Defendant raises nine points on appeal: (1) the trial court erred in granting Plaintiff's motion for JNOV and reversing the jury finding that Plaintiff was 15% at fault because Defendant made a submissible case for comparative fault; (2) the trial court erred in not letting Defendant cross-examine Plaintiff about Plaintiff's personal knowledge that the railroad crossing at issue was dangerous; (3) the trial court erred in permitting Plaintiff to call and elicit certain testimony from James Armes who was not designated as an expert witness; (4) the trial court erred in permitting Plaintiff to read portions of the deposition of Gary Allgeier, a company clerk for Defendant, where Allgeier testified regarding Section 392.10 of the Federal Motor Carrier Safety Regulations, James Sheppard's compliance with that regulation and Sheppard's fault in the accident; (5) the trial court erred in denying Defendant's motion for JNOV/New Trial and Defendant's motion for a full evidentiary hearing regarding juror non-disclosure because Defendant was denied its right to an impartial jury in that six jurors failed to respond to clear and material questions during voir dire regarding prior litigations and claims; (6) the trial court erred in refusing to admit the medical records of Dr. David Stronsky and Dr. Eli Shuter based on Plaintiff's objection to authenticity when Plaintiff stipulated to the authenticity of the records and the court released the records custodians who had been subpoenaed by Defendant; (7) the trial court erred in denying Defendant's motion for directed verdict and JNOV or Defendant's motion for a new trial because there was no credible or properly admissible evidence of Defendant's negligence or that Defendant's negligence, if any, contributed to or caused injury to Plaintiff; (8) the trial court erred in permitting the introduction of evidence of the replacement cost of insurance for Plaintiff's wife and child as this evidence was inadmissible and prejudicial; (9) the trial court erred in denying Defendant's motion for JNOV or motion for new trial as well as denying Defendant's motion for remittitur because the verdict is grossly excessive and is so excessive as to indicate bias, prejudice and jury misconduct. We affirm in part and reverse in part and remand.

## BACKGROUND

It is undisputed that, on October 18, 2000, Plaintiff, then age 56, was operating a train near Paragould, Arkansas when he approached a railroad crossing at Goldsmith Road (hereinafter the "crossing"). The crossing had no gates or warning lights. At about this time, Sheppard, an

---

1. We would like to refer the parties to Rule 84.04 and Special Rule 361. A floppy disk containing a copy of the brief shall be filed along with the written brief. Each disk should have a label identifying the caption of the case *and* the word processing format of the brief. This Court prefers the use of Microsoft Word format, but WordPerfect 5.x is also acceptable. Submissions in any other format are not acceptable. Under Special Rule 337, the preferred format for submissions of transcripts is also Microsoft Word and WordPerfect 5.x.

employee of Defendant with approximately 25 years' experience driving a tractor-trailer unit, also approached the crossing. Plaintiff's train collided with a Cornhusker truck driven by Sheppard. At that point, the train was moving at 46 miles per hour. Sheppard was killed in the accident. Plaintiff applied the emergency brake at the moment of impact.

The proper interpretation of the facts regarding what happened before the collision is disputed by the parties. At trial, two witnesses testified to the events that happened before the collision, Plaintiff and Joe Brummett, a man who lived near the crossing. Plaintiff testified regarding the collision as follows:

> We were leaving Paragould. Like I had said, I was belling [sic] up speed. There's Goldsmith crossing right before your whistle board, about a quarter of a mile. I started blowing my whistle. I noticed out of the corner of my eye this tractor-trailer coming up. And two longs, two short, that's the performance of your duties. I do not believe the man ever seen me. I never seen him. I could see him. When I got close enough that I could see him I was still doing my two longs and two shorts. But within the last ten seconds or so, I laid on it continuously because he didn't appear like he heard or seen me. And the tractor-trailer pulled up on the crossing. I big-holed the train.

Plaintiff testified that it was common for vehicles to approach crossings and he expected the tractor-trailer to stop. He testified that he saw the cab of the tractor-trailer dip down twice and he thought that meant the tractor-trailer was attempting to stop. Plaintiff said that when the train reached the crossing, the cab of the tractor-trailer was on the tracks and Plaintiff

saw Sheppard looking north, away from the train. Plaintiff could observe the crossing before the whistle board,[2] and his view was unobstructed.

He testified that as he approached the crossing he had one hand on the whistle and his other on the brake valve. Plaintiff also stated that when the collision occurred, he put the train into emergency stop.

He testified that the inertia of the train prevented it from stopping immediately on the tracks. When asked how far past the crossing the train stopped, Plaintiff testified, "I would say about three quarters of a mile, from a half to three quarters, or every bit of that." Plaintiff also testified:

> Q (By Plaintiff's counsel) Charlie, was there anything you could do to slow down or stop that train when you saw that guy run the stop sign?
>
> A No.
>
> Q Absolutely nothing you could do?
>
> A No.
>
> Q All you could do was blow your whistle and hope; is that right?
>
> A Yes.

When asked what happened to him physically during this collision, Plaintiff said:

> Again, inertia of the tonnage and the impact send—in my seat, I was slammed forward to the front and back and forth from the train, the slack going in and out, sliding forward, the load set up, train set up. And that's the effect it gives. I was slammed down to the floor, banged around from the fire wall to the control stand before I fell. And that's where I wound up was between the floor and the fire wall next to the control stand there.

---

**2.** The whistle board is approximately one-quarter mile from a railroad crossing. It indicates at what point the engineer must start blowing the whistle.

He testified that he had a window open and glass and parts of the tractor-trailer were flying in the window. Plaintiff also testified that after he got home, he had pain and numbness in his hands and back, but that he could not see his doctor immediately because the doctor was on vacation.

On cross-examination Plaintiff testified that he was able to see the crossing before he reached the whistle board and that his practice was to start blowing the whistle before he even reached the whistle board. He testified that he had not yet reached the whistle board when he first saw the tractor-trailer. Plaintiff stated that he was operating the train at a speed of 40–43 miles per hour when he first saw the tractor-trailer and he was still building speed. He said that he did not know how close the tractor-trailer was when he saw the cab dip down and he did not know the speed the tractor-trailer was going.

Q (By Defendant's counsel) Okay. What caused you to put your hand on the brake valve?

A The truck didn't stop.

Q Okay. And at the point in time where you begin continuously blowing your whistle, is that when you put your owe [sic] hand on the brake valve?

A I had my hand on the brake valve.

Q Okay. Before impact you were never able to make eye contact with the driver of the tractor trailer; were you?

A What I could see of, no.

Q After this accident, after the impact occurred, you don't know how long it took for your train to stop after you threw it into emergency; do you?

A I could give you a proximity.

Q You don't know exactly how long it took; do you?

A No.

Q But it may have stopped within half a mile of the crossing or three quarters of a mile of the crossing?

A Three quarters to a mile for sure.

Q I think yesterday you told us half a mile to three quarters?

A Half to three quarters, depends on the length of the train, that particular train I believe three quarters of a mile.

Q Okay. Was there a reason why you told us that it might have been a half mile to three quarters of a mile yesterday?

A Just depending on which brakes set up first.

Q And you really don't recall a landmark as to that would help you determine where it was that the tractor—or that the train stopped after the impact; correct?

A That is correct.

Q You put the train into emergency when the train hit the tractor trailer; correct?

A Yes.

Q And at that point in time the speed of the train was about 46 miles per hour; correct?

A Approximately.

Plaintiff also testified that the tractor-trailer never stopped from the time Plaintiff saw it until the train hit it and that Plaintiff had never lost sight of the tractor-trailer. He testified that he did not know if there was a stop sign at the crossing.

Brummett also testified regarding his observations of the accident. Through deposition testimony, Brummett stated that at the time of the accident, he was behind his house in Paragould, which is four to five hundred feet from the crossing where the accident occurred. He said that he had been living at that house since 1957. Brummett testified:

Q (By Plaintiff's counsel) What did you hear exactly?

A I heard the whistle.

Q Okay. And, did you look to see the train, at that point?

A Yeah.

Q How far would you estimate the train was from Goldsmith Road, when you first noticed that it was whistling?

A About a, about a half or a quarter of a mile.

Q And, was there anything unusual about the way he was blowing his whistle?

A Yeah, yeah, he was holding it down.

Q It was a steady—

A Yeah.

Q whistle, stronger and louder?

A Yeah.

Q Did you have any trouble hearing that?

A Hu-huh.

Q And, did he continue to blow it—

A Yeah.

Q —from then until he entered the crossing?

A Yeah

Q All right. And, Joe, is it right, at some point you turned around to look at the crossing, itself, at Goldsmith Road?

A Yeah.

Q Up until that time you were facing the other direction.

A Yeah, south.

Q Is that right?

A I was facing south. Well, the train had gotten up close to me, by then.

Q So, the train was coming from the south?

A Yeah.

Q Just about the time it got, just before it got to Goldsmith Road, you turned and looked at Goldsmith Road?

A Yeah.

Q What did you see, then?

A Well, it was stopped on the tracks.

Q Now, were you able to tell whether or not it was stopped or if it could have been moving slowly?

A No, it was stopped.

Q Okay, well, you don't actually know that—

A No.

Q —you're just saying it was stopped.

A It was stopped.

Q Okay. You weren't able to face it, though.

A No.

Q Okay, what happened next?

A Well, the train hit it.

On cross-examination, Brummett testified that it was unusual to hear the train whistle sound continuously. He testified that when he saw the tractor-trailer stopped on the tracks, the train was "getting close, about two or three hundred feet" from the tractor-trailer. He also testified when he saw the tractor-trailer at the crossing, it was just a second before the impact.

Armes testified about the amount of time it would take the brakes to set up in a Z train, the same type of train Plaintiff was driving at the time of the collision. He testified that sometimes it could take up to a minute for the brakes to set up. He also testified that in an emergency brake application, it could take up to a mile for this type of train to stop. He stated that while the brakes set up faster in emergency, it still takes time for "it to go all the way through the train."

Allgeier was named by Cornhusker as the corporate designee. At his deposition, which was admitted at trial, Allgeier testified regarding federal motor carrier regu-

lation Section 392.10(a) which requires drivers to stop before the crossing and look both ways before entering the crossing. He also testified as to Cornhusker's determination of the cause of the accident. His testimony, with objections omitted, was:

Q (by Plaintiff's Counsel) In your opinion, sir, did Mr. Sheppard, the driver of the Cornhusker tractor trailer, comply with Section 392.10 immediately prior to and at the time of this collision?

A No.

Q He didn't comply with it, did he?

A No.

Q One of the topics you've agreed to testify on today, speaking as the voice of Cornhusker, is the following topic. All determinations made by defendant Cornhusker regarding the cause of the August 18, 2000 incident. The question to you, sir, is, what was the cause of this collision?

A Failure to look in both directions at the crossing.

Q By Mr. Sheppard, correct?

A Yes.

Allgeier also testified that he did not personally conduct any investigation into the cause of the accident, but that the investigation was conducted by the insurance company. The reference to the insurance company was objected to and sustained, so the portion of the deposition regarding who conducted the investigation was not admitted at trial. He also testified that it was the determination of Cornhusker that the cause of the collision was that James Sheppard failed to yield to the train. He also testified, with objections omitted:

Q (by Plaintiff's counsel) So I take it that Cornhusker does not believe Charlie Payne did anything wrong to cause this accident, would that be fair to say?

A I would say I wouldn't know.

Q As you sit here today, as the corporate representative of Cornhusker, do you know anything or any facts that would lead you to believe or the company to believe that Charlie Payne did anything wrong in causing this accident.

A I wouldn't know.

Q You have been the person designated by Cornhusker as the person most knowledgeable regarding the facts and circumstances upon which defendant Cornhusker bases its claim that Charlie Payne's injuries were caused in whole or in part by his fault. True? You've agreed to be the corporate representative on that topic.

A Yes.

Q And you have no information or facts that would lead you to believe, as the representative of Cornhusker and speaking for Cornhusker, that Charlie Payne did anything wrong to cause this accident?

A I wouldn't know.

With regard to injuries, Plaintiff testified that he did not have visible signs of injury after the accident. He stated that he continued to operate the train for 20–25 more miles immediately after the accident. In addition, one month after the accident he was certified one hundred percent fit for duty and returned to work for Union Pacific. Plaintiff did not seek medical attention until August 24, 2000, six days after the accident. At that time he saw Dr. Davis, his family doctor. Plaintiff visited Dr. Davis two more times in connection with his injuries from the collision.

Nine months after his last visit with Dr. David Davis, Plaintiff saw Dr. George Schoedinger. Later he went to see Dr. Kee Park in Cape Girardeau. Dr. Park found degenerative changes in Plaintiff's neck and back. Dr. Park performed neck surgery on Plaintiff in January 2002 and

back surgery on Plaintiff in March 2002. Dr. Park testified that he believed the accident caused the need for the surgeries. Plaintiff had not told Dr. Park about his past neck and back problems. Plaintiff said he told Dr. Park about his accident and that he had left blank on the patient questionnaire the question about whether he had ever had similar problems in the past. He also left blank a question regarding any other work-related injuries or significant disabling injuries or illnesses, as well as a question regarding whether he had seen any other doctors regarding the condition.

Plaintiff testified that in 1985 or 1986 he hit his head in an accident and had to wear a cervical collar. In addition, he had low back pain with shooting pains down his legs. He received some physical therapy as a result of the injury and also saw Dr. Shuter regarding the injury.

Dr. John Gragnani testified on behalf of the defendant regarding Plaintiff's injuries. He testified that the accident did nothing more than exacerbate prior symptoms. He stated that loss of motion and normal movement were caused by the surgeries. He also stated: "I don't believe the neck surgery was performed because of the accident. The neck surgery was performed because this man had advancing degenerative changes, which had finally reached a point where it was felt that surgery was indicated."

---

3. Plaintiff cites *Miller v. Haynes* for the proposition that the law where the collision occurred is controlling upon the substantive rights of the parties. 454 S.W.2d 293, 297 (Mo.App.1970). However, that rule was abandoned in favor of the "most significant relationship" test. *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo.1969). Under the "most significant relationship" rule, a choice of law is made based on the predominance of contacts with the state whose law is to prevail. *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 442 (Mo.App. W.D.1986). The contacts to be taken into account are:

## DISCUSSION

### Choice of Law

The parties agree that Arkansas law applies in this case. While the case law relied upon by the trial court for this proposition is no longer applicable, we nonetheless agree that Arkansas law applies.[3] The applicable substantive law does not appear to have been addressed during trial. In fact, there are no references to Arkansas law until Plaintiff filed his motion for JNOV.

Under the most significant relationship test, the most important issue here was whether the conduct causing the injury was negligent, and this conduct occurred in Arkansas. The injury also occurred in Arkansas. Plaintiff is a resident of Missouri, but he often passed through Arkansas while working as a railroad engineer. Defendant is a Nebraska corporation with its principal place of business in Nebraska. Defendant has one facility located in Missouri. There is no relationship between the parties, except as parties to this lawsuit. Accordingly, Arkansas law governing negligence applies.

### Motions for Judgment Notwithstanding the Verdict

Both Plaintiff and Defendant filed motions for JNOV following the trial. Defen-

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
*Id.* These contacts are to be evaluated according to their relative importance with respect to the particular issue. *Id.*

dant contends, as its first point, that the trial court erred in granting Plaintiff's motion for JNOV and reversing the jury finding that Plaintiff was 15 percent at fault because Defendant made a submissible case for comparative fault.

In its seventh point, Defendant asserts that the trial court erred in denying Defendant's Motions for Directed Verdict and JNOV or Motion for New Trial because there was no credible or properly admissible evidence that Defendant was negligent or that negligence, if any, on the part of the Defendant caused or contributed to Plaintiff's injury.

### Standard of Review

■ The standard of review based on a trial court's denial of a motion for judgment notwithstanding the verdict is whether a submissible case was made. *Echard v. Barnes–Jewish Hospital,* 98 S.W.3d 558, 565 (Mo.App. E.D.2003). We will affirm the trial court's grant of the motion only where we find that a submissible case was not made. *Baris v. Layton,* 43 S.W.3d 390, 394 (Mo.App. E.D.2001). In order to make a submissible case, one must present substantial evidence for every fact essential to liability. *Echard,* 98 S.W.3d at 565. In determining whether a submissible case was made, this court views the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the prevailing party. *Id.* Whether a submissible case was made is a question of law; therefore our review is *de novo. Brockman v. Regency Financial Corp.,* 124 S.W.3d 43, 46 (Mo.App. W.D.2004).

■ This court will not overturn a jury verdict unless there is a complete absence of probative facts to support it. *Id.* Where reasonable minds can differ on the question before the jury, we will not disturb the jury's verdict. *Id.* A judgment notwithstanding the verdict is a dras-

tic action, and will only be granted when reasonable persons could not differ on a correct disposition of the case. *Id.* Furthermore, a presumption exists favoring the reversal of a judgment notwithstanding the verdict. *Baris,* 43 S.W.3d at 394.

### Plaintiff's Motion for JNOV

■ The trial court, after hearing all of the evidence, allowed the submission of comparative fault to the jury. The jury returned a verdict in favor of Plaintiff in the amount of $3,500,000, with an assessment of 15 percent fault to Plaintiff, making the net verdict $2,975,000. We find that the trial court erred in granting Plaintiff's JNOV because Defendant made a submissible case of comparative fault.

■ To establish a *prima facie* case of negligence in Arkansas, a party must show that damages were sustained, that the opposing party breached the standard of care, and that the opposing party's actions were the proximate cause of the damages. *Union Pacific R.R. Co. v. Sharp,* 330 Ark. 174, 952 S.W.2d 658, 662 (1997).

Each of these elements was covered by the comparative fault verdict-director given to the jury. The jury was directed to assess Plaintiff a percentage of fault if it found:

First, Plaintiff knew or by using ordinary care could have known that there was a reasonable likelihood of a collision in time thereafter to have stopped or slowed the train but Plaintiff failed to do so, and

Second, Plaintiff was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause any damage Plaintiff thereby sustained.

Plaintiff argues that there was insufficient evidence for a jury to find that Plain-

tiff knew, or by using ordinary care could have known, that there was a reasonable likelihood of a collision in time thereafter to have stopped or slowed the train. Plaintiff contends that the applicable law in Arkansas is that the duty of the railroad employees to take precautions begins only when it becomes apparent that the traveler at the crossing will not do so. In support of this proposition, Plaintiff relies on a line of Arkansas cases, *Missouri Pac. R. Co. v. Doyle*, 203 Ark. 1111, 160 S.W.2d 856 (1942); *Northland Ins. Co. v. Union Pacific R.R. Co.*, 309 Ark. 287, 830 S.W.2d 850 (1992) and *St. Louis Southwestern Ry. Co. v. Evans*, 254 Ark. 762, 497 S.W.2d 692 (1973).

All of these cases involve the propriety of instructing the jury regarding the train crew's failure to keep a careful lookout. In *Northland*, the Arkansas Supreme Court determined that the crew could not have stopped the train after it became apparent that the truck would not get off the tracks, and thus it was not error for the trial court to refuse to give the lookout instruction. *Id.* at 853.

In *Evans*, the Arkansas Supreme Court found that the trial court erred when it submitted the lookout instruction to the jury. *Id.* at 695. There was undisputed testimony that the plaintiff's car slowed as it approached the crossing, but it did not stop. *Id.* As the car got closer to the crossing the crew realized that the driver was not going to stop and at that point, the crew took action. *Id.* Because the train could not have stopped in time to avoid the collision, the court held that it was error to submit the lookout instruction. *Id.*

Plaintiff states that there was insufficient evidence for a jury to find that Plaintiff knew, or by using ordinary care could have known, that there was a reasonable likelihood of a collision. However, the evidence viewed in a light most favorable to the verdict indicates otherwise.[4] In Plaintiff's own testimony, he states "When I got close enough that I could see him I was still doing my two longs and two shorts. But within the last ten seconds or so, I laid on it continuously because he didn't appear like he heard or seen me." Plaintiff also testified that he put his hand on the brake valve because the truck did not stop. Furthermore, he testified that he did not put the train into emergency stop until he had hit the truck. From this evidence, a jury could find that, at any of these points, Plaintiff either knew or could have known there would be a collision. Accordingly, this evidence supports a finding that by using ordinary care, Plaintiff could have known there was a likelihood of collision in time to have stopped or slowed the train. Therefore, there was evidence that plaintiff breached the duty under either the Arkansas cases or under Missouri law.

Plaintiff's next argument, that there was insufficient evidence to find that Plaintiff's not stopping or slowing the train proximately caused his injuries, seems to be the rationale adopted by the court in determining that there was insufficient evidence to support a finding of comparative fault. The trial court's order granting Plaintiff's motion for JNOV states, in full:

1. Arkansas law applies to this case (substantive law). (*See Northland Ins. Co. v. Union Pacific R.R. Co.*, [309 Ark. 287] 830 S.W.2d 850 (S.Ct.Ark.1992).)

---

4. Plaintiff states that "substantial evidence, not speculative deductions" must be presented on each element. Plaintiff argues that the evidence submitted by Defendant was not sufficiently substantial. However, the evidence relied on by Defendant was Plaintiff's own testimony and the testimony of a witness to the event. We cannot hold that testimony from the Plaintiff and an eyewitness is not substantial evidence.

2. Evidence was insufficient to support any comparative fault finding, as distances estimated did not demonstrate train engineer's actions could have avoided collision in any event and train was not obligated to apply emergency brakes merely upon the approach of defendant's truck at grade crossing. Accordingly, judgment is amended to remove the 15% comparative fault findings of verdict, thereby further amending total judgment to the sum $3,500,000.00 (three million five hundred thousand dollars), in favor of Plaintiff Payne against Defendant Cornhusker. Costs assessed to Defendant subject to memo filed this date.

This conclusion is not supported by the record. There was evidence presented from which the jury could determine that Plaintiff's failure to stop or slow the train before impact contributed to his injuries. As we said above, there is evidence that Plaintiff knew or should have known the truck was not going to stop at some point before the collision. He testified that he laid on the horn continuously because he did not think the driver of the truck had heard or seen him. Brummett testified that the train started blowing its whistle continuously from "about a half or a quarter of a mile" from the crossing.[5] Plaintiff testified that the train stopped between one-half to three-quarters of a mile after he engaged the emergency brake.[6] Accordingly, there is substantial evidence that engaging the emergency brake could have prevented or lessened the collision, thereby preventing or lessening Plaintiff's injuries. As Plaintiff did not take any action to slow or stop the train before hitting the tractor-trailer, the evidence was sufficient for the jury to determine that Plaintiff breached the standard of care and that his actions proximately caused his injuries.

Accordingly, this court will not overturn the verdict because there was not a complete absence of probative facts to support it. As is evidenced by the hot dispute between the parties regarding the proper interpretation of the testimony given at trial, we find that reasonable minds can differ on the question of comparative fault and we will not disturb the jury's verdict. Furthermore, in close cases such as this one, the presumption favoring the reversal of a JNOV is a significant factor. Thus, we find that the trial court was correct in

**5.** This testimony is contradicted by Plaintiff's testimony that he was only about 300 feet from the crossing when he started blowing the whistle continuously. When reviewing a grant of JNOV, however, we are to review the evidence in the light most favorable to the verdict. *See Echard*, 98 S.W.3d at 565. Plaintiff argues that Brummett does not provide any basis for his estimate that the train was one-half mile away when the whistle started blowing continuously. Brummett witnessed the accident, and he testified to what he heard and saw that day. It is not our place to find facts or weigh the evidence that was presented at trial. Fact finding is reserved for the jury, and the jury arguably found his testimony credible.

**6.** Again, though Plaintiff testified that the train may have taken three-quarters mile to stop, we must examine the evidence in the light most favorable to the verdict. Plaintiff asserts that Plaintiff's own testimony regarding the stopping distance of the train is insufficient evidence to submit this issue to the jury and that expert testimony would be required to determine how long it took the train to stop. We disagree. Plaintiff, as the operator of the train, was in a very good position to determine how far the train continued on after he applied the brake. Plaintiff argues that the impact of the truck would have slowed the train and made it stop sooner than it would have had Plaintiff applied the brake before hitting the truck. Again, this goes to the weight, not the sufficiency of the evidence presented. Weighing the evidence is the responsibility of the jury, not the trial or appellate courts.

submitting the issue of comparative fault to the jury and granting the Plaintiff's Motion for JNOV was error. Point granted.

### Defendant's Motion for JNOV

■ Defendant claims that the trial court erred in denying its motions for Directed Verdict and JNOV or Motion for New Trial because there was no credible evidence that Defendant was negligent or that any negligence of the defendant directly contributed to cause injury to Plaintiff. Defendant states that Plaintiff failed to present evidence explaining the truck's presence on the tracks, claiming that the truck may have been on the tracks because of some physical impairment rather than negligence.

■ To establish a *prima facie* case of negligence under Arkansas law, a party must show that damages were sustained, that the opposing party breached the standard of care, and that the opposing party's actions were the proximate cause of the damages. *Sharp*, 952 S.W.2d at 662. A plaintiff cannot rely on conjecture or guess to constitute substantial evidence of negligence; a plaintiff also has the substantial burden of proving that the negligence of the defendant was the proximate cause of the damages suffered. *Superior Forwarding Co. v. Garner*, 236 Ark. 340, 366 S.W.2d 290 (1963). The burden is on the plaintiff to produce some substantial evidence from which the jury might find some act or omission constituting negligence by the defendant, as alleged in the petition. *Id.* Negligence can be established either by direct or circumstantial evidence, but not by inferences based on conjecture or speculation. *Id.*

Defendant argues that there are other possible reasons, besides negligence, why its truck was on the tracks at the crossing. It asserts that Sheppard, the driver of the tractor-trailer, may have had a physical impairment that may have caused loss of consciousness or impaired his ability to operate the vehicle. The Defendant cites *Kapp v. Sullivan Chevrolet Co.*, wherein the plaintiff's seatbelt broke and she was injured in a collision. 234 Ark. 395, 353 S.W.2d 5, 17 (1962). She brought suit against the defendant alleging that her injuries resulted from a defective seatbelt. *Id.* The court held that a directed verdict in favor of the defendant was proper and in doing so stated: "Several *possible* causes of the break are argued, but in truth, there are only *possibilities*, and do not reach the status of probabilities. Negligence cannot be established by guess work." *Id.* at 18. *Kapp* is not persuasive on this point. Under review for directed verdict, we examine the *facts* of the case to determine whether a case was submissible. *Kapp* is a products liability action and the relevant facts in that case deal with the manufacture and installation of the seatbelt. Furthermore, the court stated that reasonable inferences may be drawn from positive or circumstantial evidence, but to allow inferences to be drawn from other inferences would carry the deduction into the realm of speculation and conjecture. *Id.* at 417, 353 S.W.2d 5.

That is not what happened in this case. There was evidence that Sheppard was looking north, away from the train as he approached the crossing. Sheppard was not looking at the train, or even in its direction, when he was approaching the crossing. The truck did not stop as it approached the crossing, even though there was a stop sign. Not stopping at the crossing violated company policy and federal regulations. This is substantial evidence from which a jury could infer that Sheppard was not paying attention as he approached the crossing. This evidence was sufficient to submit this case to the

jury. Accordingly, we cannot say that the trial court abused its discretion in denying Defendant's motion for new trial. Point denied.

## EVIDENTIARY ISSUES

 Defendant raises multiple claims of error in what evidence the trial court admitted or excluded. The appellant bears the burden of establishing an abuse of discretion by the trial court in excluding evidence. *Burns v. Elk River Ambulance, Inc.,* 55 S.W.3d 466 (Mo.App. S.D.2001). The focus on appeal of a ruling excluding evidence is not whether evidence was admissible but on whether the trial court abused its discretion in excluding the evidence. *Id.* Logically, relevant evidence should not be excluded unless it pertains to collateral matters, which would result in confusion of the issues or would cause prejudice wholly disproportionate to the value and usefulness of the offered evidence. *Edgell v. Leighty,* 825 S.W.2d 325, 327 (Mo.App. S.D.1992).

We give substantial deference to a trial court's ruling regarding the admissibility of evidence and will not overturn such a decision unless the court abused its discretion. *Strycharz v. Barlow,* 904 S.W.2d 419, 423 (Mo.App. E.D.1995). We presume discretionary rulings of a trial court are correct. *Id.* However, a trial court abuses its discretion when a ruling shocks one's sense of justice, indicates a lack of consideration, and is clearly against the logic of the circumstances. *Id.*

### Plaintiff's Knowledge of the Crossing

 In its second point, Defendant claims that the trial court erred in refusing to allow the cross-examination of Plaintiff concerning his personal knowledge that the crossing was dangerous. Defendant contends that this evidence was admissible and relevant to determine the full degree of Plaintiff's comparative fault. The trial court ruled that the evidence was inadmissible partially because it would confuse the jury. The railroad, as mandated by the Federal Railroad Safety Act and subsequent regulations, must construct and maintain good and sufficient crossings, and state tort claims regarding the sufficiency and safety of crossings are pre-empted by federal law. *See Norfolk Southern Ry. Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). The trial court deemed that the evidence concerned the safety of the crossing. The railroad, which was not a party to the action, was responsible for the safety of the crossing. Accordingly, the trial court determined that the evidence would be confusing to the jury. We must give *substantial* deference to the trial court's determination regarding the admissibility of evidence during trial and accordingly, we cannot hold that it was an abuse of discretion for the trial court to exclude this evidence. Point denied.

### James Armes' Testimony

 Defendant also claims that the trial court erred in allowing Armes to opine about the stopping times and the distances of freight trains and the timing release of or from the brakes of the trains. It also claims that it was error to allow Armes to testify regarding his opinion about the right-of-way of trains. Defendant states that this evidence was inadmissible, unduly prejudicial and unfairly surprised Defendant because Armes was not disclosed as an expert witness and Defendant therefore never had the opportunity to discover his opinions before trial or attempt to rebut his opinions through other expert testimony. Moreover, Defendant claims the opinions were speculation and conjecture and invaded the province of the jury.

However, a review of the transcript reveals that Defendant invited discussion re-

garding the stopping distance of the train. During direct examination, Armes did not testify regarding any opinions. He testified about his knowledge of air brakes and his general familiarity with the type of engines involved in the accident. He testified to the amount of time (one minute), not distance, it would take for a train's braking system to set up. On cross-examination, Defendant's counsel asked Armes to clarify the difference between normal stopping and emergency stopping. Again Armes testified it would take about a minute for the brakes to set up and the train to begin to slow. As a follow-up question on re-direct, Plaintiff's counsel asked how long it takes for the brakes to set up in an emergency application of the brakes. Armes testified that it takes about half the time as it takes for the regular brakes to set up, but that it depends on the composition of the train. On re-cross-examination, Defendant's counsel attempted to impeach Armes by asking if he actually knew the composition of the train that was in the accident. Armes stated that he did not know for sure. Then, on continued re-direct examination, Plaintiff's counsel showed Armes an exhibit detailing the composition of the train that was in the accident. At this time, instead of asking how long it would take for the brakes to set up on this particular train, Plaintiff's counsel asked how long it would take for the train to stop. At this point Defendant objected apparently simultaneously with Armes' answer of "about a mile." The objection was overruled. We cannot say the court abused its discretion in admitting this evidence, as it seems this testimony was invited. Although Defendant objected multiple times, it also continued to question Armes about the stopping distances of trains. Furthermore, we are required to give deference to the trial court's decisions regarding the admissibility of evidence. This point is denied.

### Gary Allgeier's Testimony

■ In its fourth point, Defendant states that the trial court erred in permitting Plaintiff to read the portions of the Deposition of Allgeier. Allgeier was named by Cornhusker as its corporate representative pursuant to Rule 57.03(b)(4). This rule provides that the person named by the corporation to testify to matters on its behalf shall testify as the matters known or reasonably available to the organization. Plaintiff deposed Allgeier and elicited testimony concerning Section 392.10 of the Federal Motor Carrier Safety Regulations and whether Sheppard violated the regulations. In addition, Allgeier admitted the collision was caused by Sheppard's failure to look in both directions and yield the right of way.

Defendant claims that this evidence was inadmissible for multiple reasons: Plaintiff did not plead any allegation of negligence against Defendant for purportedly violating such a regulation; because Allgeier was not a witness to the accident and never conducted any investigation into the accident; because Allgeier was not endorsed or qualified as an expert in truck safety, federal regulations or the operation of a truck; and because the questions asked exceeded the scope of the deposition notice.

■ Defendant also claims that the evidence was beyond the scope of the pleadings. Missouri Supreme Court Rule 55.05 [7] requires that a plaintiff set forth with factual specificity each basis that will entitle the plaintiff to relief in order to inform the defendant of what the plaintiff will attempt to establish at trial. In the face of an objection, a plaintiff's evidence

---

**7.** All rule references are to Mo. Rules Civ. P. 2004 unless otherwise indicated.

must conform to the pleadings. *Textron Financial Corp. v. Trailiner Corp.*, 965 S.W.2d 426, 431 (Mo.App. S.D.1998). Defendant asserts that because Plaintiff only pled negligence, and did not plead any allegations against defendant for violating 392.10 or negligence per se, admission of this regulation was beyond the scope of the pleadings. We disagree.

The regulation at issue specified that drivers of commercial vehicles should stop within 50 feet, but not closer than 15 feet, of the railroad tracks. 49 C.F.R. Section 392.10 (2005). The regulation states that drivers should look and listen in each direction for an approaching train to ascertain that no train is approaching. 49 C.F.R. Section 392.10.

This regulation is evidence of Sheppard's duty to stop before the crossing, look both ways and listen before proceeding through the crossing. In a factually similar common law negligence case, a street car operator was injured when the streetcar he was operating struck another streetcar sitting on the track. *Kinney v. Metropolitan St. Ry. Co.*, 261 Mo. 97, 169 S.W. 23 (1914). The court stated, regarding a city ordinance that was admitted as evidence but not included in the pleadings, "[i]f a cause of action is based directly on a violation of a duty imposed alone by a municipal ordinance, the pleading should set forth the specific ordinance in hand, because courts will not take judicial notice of its existence. But if an ordinance of a city is used as a mere matter of evidence, no good reason is perceived why it should be pleaded[.]" *Id.* Thus, evidence of the regulation was not improperly admitted as it was evidence of Sheppard's duty, an element of common law negligence.

■ Defendant claims that the portions of Allgeier's deposition where Allgeier stated that Sheppard violated the regulation and failed to yield to the right-of-way of the train should not have been admitted because Allgeier was not a witness to the collision, nor did he investigate the collision, nor was he qualified as an expert in truck safety. Defendant asserts that Allgeier's conclusions about the accident, including his statement that the accident was a result of Sheppard's failure to look in both directions at the crossing, are speculation and conjecture.

■ Plaintiff contends that Allgeier was designated by the defendant as the corporate representative to testify regarding matters known to the corporation and therefore, Allgeier's statements are admissible as admissions of a party opponent. For an admission by a party-opponent to be admissible: 1) the statement must be a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts; 2) the matter acknowledged must be relevant to the cause of the party offering the admission; and 3) the matter acknowledged must be unfavorable to or inconsistent with the position now taken by the party-opponent. *Bowls v. Scarborough*, 950 S.W.2d 691, 702 (Mo.App.W.D. 1997).

Here, the statements were a conscious acknowledgment by the person designated by the corporation to be most knowledgeable about the circumstances of the collision regarding the cause of the accident; the cause of the accident was relevant to the plaintiff's claim that Cornhusker was at fault; and the admission that Sheppard failed to look both ways and yield the right of way was inconsistent with the position taken by Cornhusker at trial. Therefore, Allgeier's testimony was properly admitted at trial as admissions of a party opponent.

■ Allgeier's testimony regarding Cornhusker's conclusions about the cause of the accident was not beyond the scope of his knowledge and understanding. He

was the employee identified by the Defendant as having the most knowledge about the items identified in the deposition notice, which included "all determinations made by Defendant regarding the cause of the August 18, 2000 incident." While Allgeier did not personally conduct an investigation and make determinations regarding the cause, the Defendant's insurance company conducted an investigation and Defendant appointed Allgeier to testify about the determinations made by Defendant regarding the cause of the accident. The fact that the insurance company investigation could not be referred to in front of the jury does not change the fact that Allgeier had the knowledge of the results of the investigation and Cornhusker's subsequent determination as to its cause.

■ This testimony did not invade the province of the jury. Allgeier testified that Defendant had determined that the cause of the collision was Sheppard's failure to look in both directions at the crossing. He did not testify that the collision was caused by Sheppard's negligence. Although the jury was free to infer that the failure to look in both directions at the crossing was negligence, Defendant was also free to and did argue during closing arguments that Sheppard was stopped upon the tracks for a reason that was not negligence. Defendant argued that maybe Sheppard was stopped there because he was not "okay."

■ Defendant also argues that the questions asked were beyond the scope of the deposition notice and that the notice did not contain "any indication that Plaintiff intended to cover motor carrier safety regulations and possible negligence stemming therefrom." This argument is specious. The deposition notice states "Defendant must present one or more officers, directors or managing agents, or other persons who consent to testify on its behalf as to the following matters: 2. All written safety rules, policies or procedures provided by defendant to [Sheppard]." Allgeier testified that Cornhusker provided its drivers with copies of the Federal Motor Carrier Safety Regulations. Thus, these regulations fall squarely within the notice of "safety rules ... provided by defendant to [Sheppard]." Point denied.

### Exclusion of Medical Records

■ Defendant's sixth point is that the trial court erred in refusing to allow the defendant to introduce the medical records of Dr. Stronsky and Dr. Shuter. The trial court refused to allow the records based on an authenticity objection. Defendant claims that it had subpoenaed the custodian of medical records to trial, but the trial court released the custodian when Plaintiff's counsel stipulated to the authenticity of the records and the court agreed to allow admission of the records. Plaintiff claims that the court did not err in excluding these records in that the records were duplicative of other evidence presented at trial and were not probative because they were for injuries incurred by Plaintiff fifteen years earlier.

■ Two statutes are applicable to the competency of business records, such as medical records. Section 490.680 [8] says that a record is "competent evidence" if the custodian of the record or another qualified witness testifies to its identity and the mode of its preparation, whether it was made in the regular course of business at or near the time of the act and if the court determines that the methods and time of preparation were sufficient to justify admission. Alternatively, Section 490.692 provides that business records can

8. All statutory references are to RSMo.2004 unless otherwise indicated.

be admissible if an affidavit of the person stating that the records attached to the affidavit were kept as required by law. Section 490.692 also provides that the records and affidavit must be served on all other parties to the action at least seven days prior to the commencement of the trial. Thus, although Section 490.680 requires a foundation consisting of testimony by a qualified witness, Section 490.692 allows this foundation to be established with an affidavit rather than by direct testimony. *Smith v. Director of Revenue,* 948 S.W.2d 219, 221 (Mo.App. E.D.1997). There is no requirement that evidence be supported by both direct testimony and an affidavit.

 It is unclear from the record exactly what happened. If the trial court did exclude the testimony on the basis that the testimony had to be accompanied both by testimony and an affidavit, that was error. However, we will uphold a trial court's evidentiary rulings if proper on any ground, even if not the ground asserted. *Foster v. Barnes–Jewish Hosp.,* 44 S.W.3d 432, 438 (Mo.App. E.D.2001). In this case, exclusion of these records would have been proper if they were excluded on the grounds that the records were cumulative. Much of the content of the records was presented to the jury during the deposition of Dr. Gragnani. Defendant also elicited testimony from Plaintiff regarding his 1986 back injury and subsequent back problems during cross-examination. Furthermore, Defendant read physical therapy records to the jury also detailing problems Plaintiff had resulting from his 1986 back injury. Thus, reading the records to the jury would have been cumulative and exclusion for that reason would have been proper. This point is denied.

*Admission of Plaintiff's Fringe Benefits*

 In its eighth point, Defendant states that the trial court erred in permitting the introduction of evidence about the cost of health insurance and other benefits Plaintiff was receiving from Union Pacific as well as introducing testimony about the replacement cost of insurance for Plaintiff's wife and child. We disagree. The fringe benefits, including health insurance, were part of Plaintiff's compensation from the railroad. When Plaintiff was no longer able to work for the railroad, he lost not just his paycheck, but also his benefits. As stated above, we give great deference to the trial court's decisions regarding the admissibility of evidence. We cannot say the trial court abused its discretion in admitting this evidence as it goes to show the total amount of Plaintiff's damages. Point denied.

*Juror Nondisclosure*

 Defendant argues next that the trial court erred in denying its motion for JNOV or Motion for New Trial and in denying Defendant's motion for a full evidentiary hearing regarding juror non-disclosure. Plaintiff's counsel asked during voir dire, "Any of you been a party to a lawsuit?" When there was no response, Plaintiff's counsel continued with his questioning by narrowing the question to injury claims. Defendant contends that six jurors failed to respond to clear and material questions asked during voir dire concerning prior lawsuits, litigation and claims.

 Parties to a suit have a constitutional right to a fair and impartial jury, and to that end, both parties are entitled to unbiased jurors whose experiences will not prejudice the resolution of the cause. *See Grab ex rel. Grab v. Dillon,* 103 S.W.3d 228, 240 (Mo.App. E.D.2003). The essential purpose of voir dire is to provide for the selection of a fair and impartial jury through questions which permit the

intelligent development of facts which may form the basis of challenges for cause, and to learn such facts as might be useful in intelligently executing peremptory challenges. *Id.* Voir dire also gives parties the opportunity to expose a potential juror's biases in the type of suit being tried. *Id.* It is the duty of venirepersons to fully, fairly, and truthfully answer all questions so that qualifications for service may be determined and challenges properly exercised. *Id.* The findings of the trial court when ruling on a motion for new trial on the grounds of juror misconduct are given great weight, and we will not disturb these findings on appeal unless the trial court abused its discretion. *Id.* at 241. Nondisclosure occurs only after a clear question posed to the jury panel unequivocally triggers a duty to respond. *Id.*

 Thus, the first question to be answered when determining whether juror nondisclosure has occurred is: was the question the juror is alleged to have failed to answer clear? *Id.* Our review of the clarity of the questions is de novo, and the standard for clarity is whether a lay person would reasonably conclude that the undisclosed information was solicited by the question. *Id.* If the question is not clear, there has been no nondisclosure. *Id.*

The question referred to by Defendant was actually phrased:

Plaintiff's counsel: Anyone else, medical training experience? Any of you been a party to a lawsuit? Whether you had a claim for injury or you may have been sued for an injury?

A venireperson responded with, "I was involved in an accident which the party claimed that it was my fault, ..." The venireperson described his experience. Plaintiff's counsel again asked, "Anyone else with a prior claim?" Another venireperson disclosed two different accident claims. Plaintiff's counsel again asked: "Anyone else? Prior claim? It doesn't have to be a law suit, just involved in an accident that had some kind of claim. Anyone over here in the six? How about the first row?" A venireperson answered about a worker's compensation case. Plaintiff's counsel asked "Anyone else?" and another venireperson spoke up and described his wife's accident. "Second row, anybody involved in an accident?" elicited a response regarding a worker's compensation claim. Two more questions asking "[a]nyone else" elicited two more worker's compensation claims, a car accident, a dog-bite case and an assault case. The final question was "[a]nyone else, prior claim, prior lawsuit?" One more venireperson responded regarding a vehicular accident.

Defendant's counsel also asked these questions during voir dire: "I think one thing and I know there have been some questions about accidents that people have been involved in and claims that have been filed. I want to touch base on a couple of those. Has anyone here or say an immediate family member or close friend ever been involved in an accident with a tractor trailer?" Then "[a]nyone else again who themselves or an immediate family member or close friend?" and "[a]nyone else, again, themselves or immediate family or close friend been involved in an accident with a tractor trailer? I don't see any other hands."

Defendant then asked:

"One of the things I wanted to revisit with you again, if you have already answered this question, you don't need to respond again. But is there anyone else here who, since it was asked previously, recalls that you have been involved in some type of claim which you have sought money from another person or

an individual or a from a company? Anyone else who since we were thinking about this has recalled being involved in some type of accident or injury or on the job claim where you have filed a claim against another person or a company for those injuries?"

Lastly, Defendant asked "Anyone else that has thought of any claims that they have made against another person or a company for personal injuries or monetary damages? I don't see any hands. Thank you."

The Defendant now questions six jurors' failure to disclose:

(1) Juror Roberts–Young was involved in an adult abuse case. She was sued twice by the Jury Supervisor for failure to appear for jury duty, being held in contempt once. She was sued twice by the Collector of Revenue for alleged failure to pay taxes. She was also involved in various domestic relations suits.

(2) Juror Pettitt was a defendant in a breach of contract action, wherein a default judgment and a writ of execution were entered against him.

(3) Juror Harris–Gordon has been sued at least three times by the Collector of Revenue for alleged failure to pay taxes due. In addition, she was a defendant in a breach of promissory note suit. She was a defendant in a small claims matter and a breach of contract matter. She was a defendant in another breach of contract/action on account matter, wherein a default judgment and writ of execution were entered against her. Finally, she was involved in various domestic relations suits.

(4) Juror Smith had been sued by the Collector of Revenue for alleged failure to pay taxes. In addition, he was involved in a domestic relations suit.

(5) Juror Gray was the plaintiff in a property damage case.

(6) Juror Curry was the defendant in a replevin case. In addition, juror Curry was involved in a domestic relations suit.

Defendant claims that given the questions posed, it is clear that an ordinary lay person would have concluded they should disclose prior litigation claims and the failure of the jurors to disclose their prior litigation experiences were intentional non-disclosures on material issues. We disagree.

The Missouri Supreme Court in *Brines v. Cibis*, 882 S.W.2d 138 (Mo. banc 1994) held:

[Q]uestions and answers pertaining to a prospective juror's prior litigation experience are material. The fact that a prospective juror has been sued as a defendant or has prosecuted cases as a plaintiff may cause the juror to be predisposed to defendants or to plaintiffs, as the case may be. The possibility of that predisposition makes the questions and answers material.

*Id.* at 139–40. In *Brines*, the Court held that the question—Do we have anyone on the [jury] panel who is now or has ever been a defendant in a lawsuit—"unequivocally triggered the prospective juror's duty to disclose previous lawsuits against them." *Id.* at 139–140. In *Meglio*, the court refused to grant a new trial when appellant's attorney had specifically limited the questioning to personal injury by stating "I'm going to limit this just to claims for personal injuries, not for property damage to a car or property damage to a house." *Meglio v. Hebel*, 759 S.W.2d 615, 616 (Mo.App. E.D.1988).

In a case factually similar to the case at hand, the court determined that questions were not specific enough to require a new trial. *Keltner v. K–Mart Corp.*, 42 S.W.3d 716, 726 (Mo.App. E.D.2001). In *Keltner*, the question was: "Has anyone claimed

you did something wrong that you are responsible for, an injury or something else, and filed a claim or suit against you." *Id.* A juror did not disclose collection suits in bankruptcy. *Id.* at 718–19. The defendant claimed that the "or something else" in the question broadened the question to include all prior law suits. *Id.* However, the court did not accept that interpretation. The court determined that the question was not clear enough to require disclosure of all prior lawsuits. *Id.* at 727.

Likewise, under the circumstances of this case, we cannot find that a clear question requiring disclosure of all prior suits was asked. The very first general question asked regarding lawsuits was *immediately* followed up with a question about suing or being sued for an injury. Then another follow up question stated "It doesn't have to be a law suit, just involved in an accident that had some kind of claim." Another question regarding accidents was then proffered. The words "accident" and "injury" were mentioned multiple times during the questioning. The defendant asked three times whether anyone was involved in a claim where they "sought money" and whether they had ever made claims for "personal injuries or monetary damages."

Accordingly, it would be reasonable for the jurors to have assumed that the questions were solely regarding injury claims. The non-disclosed claims cited by Defendant do not involve injury claims. Neither Plaintiff nor Defendant questioned the prospective jurors about family law matters or about debtor/creditor claims, taxes or property damage not sustained in a collision with a tractor-trailer. Defendant argues that the general questions should have triggered responses regarding these matters, but we disagree. The general questions asked were followed by specific referrals to injury suits. No one on the panel brought up these kinds of suits. If Defendant was concerned about domestic relations actions, tax suits and so forth, it should have asked about these during voir dire. We will not find that jurors failed to disclose answers to questions when the questions were not asked.

### Remittitur

■ In Defendant's last point, it claims that the trial court erred in denying Defendant's motions for JNOV or Motion for New Trial and Remittitur because the verdict is grossly excessive under the evidence presented.

■ The standard of review for a trial court's denial of a motion for remittitur is for abuse of discretion. *LaRose v. Washington University,* 154 S.W.3d 365, 370 (Mo.App. E.D.2004). Remittitur will be considered appropriate where the verdict of the jury is excessive because it exceeds fair and reasonable compensation for plaintiff's damages. *Id.* A trial court has broad discretion in ordering remittitur, and its decision whether to reduce damages awarded by a jury will not be disturbed on appeal unless there is an abuse of discretion that is so exceedingly excessive that it shocks the conscience and convinces an appellate court that both the trial court and the jury have abused their discretion. *Missouri Dep't of Transp. ex rel. PR Developers, Inc. v. Safeco Ins. Co. of Am.,* 97 S.W.3d 21, 40 (Mo.App. E.D. 2002). In reviewing whether or not a verdict is excessive, this court must consider only the evidence which supports the verdict, and exclude that which disaffirms it. *Id.* We may not weigh the evidence in a jury-tried case. *Id.* This court determines only if there is sufficient evidence to support the verdict, and a jury's verdict will not be set aside unless there is a

complete absence of evidence to support it. *Id.*

In the case at hand, Plaintiff's total loss of wages and fringe benefits was as much as $1,131,972.00. There was evidence presented regarding his past medical expenses of $181,285.00. There was also evidence presented about the amount and type of pain suffered by Plaintiff and the limitations the pain causes him to suffer. The evidence about Plaintiff's non-economic damages was not contested. In this case, however, the jury was asked to determine the amount of non-economic damages suffered by Plaintiff, and we do not find the total amount excessive. Under our standard of review, and having found that there was sufficient evidence to sustain the jury's verdict, we find that the trial court did not abuse its discretion in denying remittitur.

### Conclusion

Affirmed in part and reversed in part. The order of the trial court granting of Plaintiff's motion for JNOV is reversed. We reinstate the jury finding that Plaintiff was 15 percent at fault and remand with directions to reinstate the verdict in the amount of $2,975,000. Defendant's other points are denied, and the rulings associated with them are affirmed.

CLIFFORD H. AHRENS, P.J., and GLENN A. NORTON, C.J., concur.