William L. McBURNEY,
et al., Appellants,

v.

Jeffrey C. CAMERON, et
al., Respondents.

No. WD 65679.

Missouri Court of Appeals,
Western District.

Jan. 22, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 4, 2008.

Application for Transfer Denied
April 15, 2008.

David H. Dunlap, Kansas City, MO, for Appellant.

Norman Irwin Reichel, Jr., Overland Park, KS, and David Thurman Greis, Kansas City, MO, for Respondent.

Before VICTOR C. HOWARD, P.J., HAROLD L. LOWENSTEIN, PAUL M. SPINDEN, JAMES M. SMART, JR., JOSEPH M. ELLIS, THOMAS H. NEWTON, and LISA WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

The husband and children of Doris McBurney (deceased) appeal the judgment of the Circuit Court of Jackson County in favor of the defendants, Dr. Jeffrey Cameron, Karen Gage, and Kansas City General and Vascular Surgery, P.C., on the appellants' wrongful death medical malpractice claim filed pursuant to section 537.080.[1]  The judgment is affirmed.

## Background

On July 30, 2001, Mrs. McBurney, then age 77, entered Research Hospital in Kansas City, Missouri, for surgery to repair a small ventral hernia near her navel.  Dr. Cameron, assisted by Gage, performed the laparoscopic surgery, which lasted approximately one hour.  Mrs. McBurney was kept overnight in the hospital for observation and was scheduled to be released the following day, July 31, 2001.  However, due to postoperative complications, she was not released.

By August 2, 2001, the third day following the surgery, Mrs. McBurney's abdomen was swollen, and she had developed adult respiratory distress syndrome, which is a serious reaction of the lung to some form of injury.  Due to her deteriorating condition, Dr. Cameron, on August 7, eight days after the surgery, reopened the surgical site to inspect for any infection.  He found an abscess in a subphrenic cavity, indicating the presence of an infectious process, and a one-centimeter perforation of the small bowel.  Dr. Cameron repaired the perforation and cleansed the abdomen.  The next day Mrs. McBurney passed away.

---

1.  All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

Thereafter, the appellants filed a petition against the respondents for the wrongful death of Mrs. McBurney, naming Cameron, Gage, and Kansas City General & Vascular Surgery, P.C., as defendants. Kansas City General & Vascular Surgery, P.C., was named as a defendant based on a theory of vicarious liability. In their petition, the appellants alleged medical negligence as the cause of Mrs. McBurney's death. They alleged that during the first surgery, Cameron perforated Mrs. McBurney's small bowel, allowing postoperative leakage into her abdomen, resulting in conditions that led to her death. They also alleged that the respondents were negligent in that they failed to inspect and repair the perforation in a timely and reasonable fashion that would have saved her life.

In February 2005, the appellants' case proceeded to a jury trial. During *voir dire,* the appellants' counsel asked, among other things, about prior involvement in personal injury litigation by any venire member (or any family member). A venireperson named Marchant disclosed that his brothers had been involved in personal injury litigation. With regard to a later question about whether anyone had "been a defendant in a claim or lawsuit," Marchant did not respond. Marchant sat on the jury and served as the foreperson.

After a jury verdict for the defendants, the appellants checked the civil litigation records and found that Merchant, along with his parents, had been sued by three different business suppliers. Appellants filed a motion for new trial alleging, *inter alia,* intentional nondisclosure by Mr. Marchant, for failing to disclose, when asked during *voir dire* about previous litigation experience, that he had been sued in connection with these debts.

At a hearing on the motion for new trial, Mr. Marchant, under questioning by appellants' trial counsel, stated that Marchant's Decorating Services, which was owned by his parents and in which he also apparently had some ownership interest, had been sued because the business was financially unable to pay its suppliers. He acknowledged that he also was personally named as a defendant and served with process. Marchant testified that he did not mention this matter during *voir dire* because he did not think of it in connection with the questions asked by counsel. Marchant did not indicate that the suits were unjustified.

The trial court, after stating on the record several times that it believed there was no intentional nondisclosure because it could reasonably be understood that the questions were asking only about *personal injury* claims and lawsuits, denied the appellants' motion for new trial.

## I. Nondisclosure Issue

In their first point, the appellants claim that the trial court erred in denying their motion for new trial, because the record of the motion hearing established intentional nondisclosure of prior litigation experience by Mr. Marchant. They point out that counsel's question during *voir dire* solicited information about whether or not any of the venire members had ever been "a defendant in a claim or lawsuit." Appellants contend that Marchant was guilty of misconduct for nondisclosure of a material matter.

The parties to a lawsuit have a right to a fair and impartial jury composed of twelve qualified jurors. *Nadolski v. Ahmed,* 142 S.W.3d 755, 764 (Mo.App. 2004). During *voir dire,* each prospective juror is under a duty to "fully, fairly and truthfully answer each question asked so that determinations may be made about each juror's qualifications and counsel may make informed challenges." *Id.* If there is

an intentional nondisclosure of a material matter, prejudice will be presumed, resulting in the necessity of a new trial. *Id.*

## A. Timeliness

Initially, we comment on the issue of the timeliness of the appellants' efforts in researching the litigation history of those chosen to serve on the jury. Because conducting a civil jury trial is extremely demanding, we do not wish to add another burden to counsel's checklist; but timeliness in a juror challenge is important in view of the expense and burden to parties and taxpayers of conducting another jury trial. If the issue is raised before submission of the case, there remains time to remove a challenged juror and to replace that juror with an alternate.

The common delay in checking records generally seems to be based on counsel's assumptions 1) that the *voir dire* questions were all clear in context; and 2) that all the jurors tend to be very open and forthright, happy to inform counsel of every matter remotely related to a question, even if the matter is personally embarrassing to the juror. Experience continues to confirm that such assumptions are unrealistic.

It would be realistic for an attorney to send a member of his or her clerical staff to any computer, at any time of day or night, to research the civil litigation records before submission of the case, rather than waiting until after an adverse verdict to do so. The appellants in this case had more than a week after the selection of the jury and before submission of the case to raise this issue, but did not do so.

Another result of the delay, besides sometimes having to conduct a new trial, can be collateral damage to innocent jurors who have already donated a significant amount of time to the matter. In this case, another juror (besides Marchant) was subpoenaed to appear at the motion hearing—an unnecessary disruption for her, as it turned out, because that juror was merely a victim of name confusion. She had not been sued; her name was identical to that of someone who had been sued. A timely raising of the issue of prior litigation would have timely resolved the issue not only as to Marchant, but would also have saved her from a compelled appearance at a post-trial hearing.

The issue of timeliness was raised in *Brines v. Cibis,* 882 S.W.2d 138 (Mo. banc 1994). In that case, plaintiffs appealed an adverse verdict on the basis of one juror's failure to disclose on *voir dire* that he had been sued several times in collection cases. *Id.* at 139. The defendants there argued that the claim was untimely, amounting to waiver, because the plaintiff could have researched the jurors' experience, through the use of "due diligence," well before the jury began its deliberations. *Id.* at 140. This was the first time that the issue of timeliness had been raised with regard to a search of juror litigation histories. The Court, at that time, declined to adopt defendant's argument that an issue about litigation history must be raised before submission. *Id.* However, the issue may not necessarily be settled forever in view of the technological advances in the thirteen years since *Brines.*

The Missouri court system now has an automated case record service, CaseNet, by which civil litigation history can be readily accessed by any computer at any time. This was not true at the time the Court considered the issue in *Brines.* At some point, counsel (or perhaps a court) will again raise the issue of timeliness and waiver, at least with regard to cases that extend beyond a short time. We encourage counsel to make such challenges *before* submission of the case whenever practicable.

The issue of timeliness has not been raised in this case. We will move to the merits of the appeal, but we commend consideration of this matter to the attention of counsel trying future cases.

### B. The Threshold Issue—Clarity

■ While a juror has a duty to respond truthfully, the lawyers have a duty to frame their questions in a way that makes clear what information is being sought. Ambiguity in the phrasing of questions cannot create a unilateral option to demand a new trial based on nondisclosure. Thus, intentional nondisclosure can be found only if a *clear* question is asked on *voir dire*. *Wingate By Carlisle v. Lester E. Cox Med. Ctr.*, 853 S.W.2d 912, 916 (Mo. banc 1993); *Bell v. Sabates*, 90 S.W.3d 116, 120 (Mo.App.2002). There is no issue of nondisclosure when the question does not trigger a duty to respond. *Payne v. Cornhusker Motor Lines, Inc.*, 177 S.W.3d 820, 841 (Mo.App.2005).

■ The first issue, therefore, in a case of claimed nondisclosure is whether the question, in context, was clear and unambiguous. *See Wingate*, 853 S.W.2d at 916. This is an objective inquiry that looks to whether the appellant can show that there exists "no reasonable inability to comprehend the information solicited by the question." *Brines*, 882 S.W.2d at 139. In other words, if a person could reasonably be confused, the question is not sufficiently clear to warrant further inquiry into the alleged nondisclosure. *See Keltner v. K-Mart Corp.*, 42 S.W.3d 716, 726 (Mo.App. 2001).

■ The burden of demonstrating from the record that the question was clear and unambiguous is logically on the party who is seeking a new trial, especially when that party's counsel was the one who framed the question in the first place. With regard to the issue of clarity of the question, it cannot help an appellant to argue that a reasonable venire member *could have* understood the question (that is, could have understood what counsel intended). The issue is whether a reasonable venire member *would have* understood what counsel intended. The question is clear only if "a lay person *would* reasonably conclude that the undisclosed information was solicited by the question." *Keltner*, 42 S.W.3d at 726 (emphasis added). *See also Williams By and Through Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 37 (Mo. banc 1987); *Payne*, 177 S.W.3d at 841; and *Ewing v. Singleton*, 83 S.W.3d 617, 621 (Mo.App.2002) (the opinion in each case using the word "would" rather than "could" in reference to the juror's ability to understand what counsel was seeking). If a reasonable member *could have* understood the question's intent, that fact is not sufficient by itself to cause us to declare that the question was clear. *See Ewing*, 83 S.W.3d at 621.

■ The threshold determination of the clarity of a question is reviewed *de novo*. *Id.* It is only after it is objectively determined that the question *was* reasonably clear in context that we consider, under an abuse of discretion standard, whether the trial court abused its discretion in deciding whether a nondisclosure was intentional. *Id.; see also Williams*, 736 S.W.2d at 36.

### C. *Voir Dire* in this Case

In this case, in *voir dire*, plaintiff's attorney asked whether anyone had ever:

> made a *claim against somebody for injuries?* And ... *this* is for any reason.[2]

2. In the quotations from the *voir dire* colloquy in the transcript, we have chosen to add em-

After one person mentioned a wrongful death claim, counsel elaborated that he was wondering whether any of them had . . .

experiences in the legal system that—and *specifically claims for personal injury*—that will color the way you think about this case, okay?

Counsel then said that, "**in the interest of time, he would lump lawsuits and claims into the same category.**" He asked whether anyone had . . .

*filed a lawsuit, made a claim* or members of your immediate family in the jury box?

Venireperson Marchant was the first to respond. He told about two personal injury matters from his family. Marchant said these instances would not cloud his judgment. Counsel also informed the venire that he was interested in experiences in which they "[got] **sued and [they did not] think it was proper**," to which Marchant responded "Right."

Counsel continued:

*Anyone else,* claim or lawsuit where you actually made a claim or member of your immediate family? Okay, let's just deal with this—*you group of folks first* [:][a]nyone else ever had a—*been a defendant in a claim or lawsuit* or members of your immediate family other than what we have just talked about?

This question about being a "**defendant in a claim or lawsuit**" is the *voir dire* question on which appellants base their challenge. Appellants say that Marchant should have, but failed, to disclose the prior business collection matter.

The record here does not show any response by any venireperson—Marchant or

any of the other forty or so members. Counsel then followed with a question directed to a different set of venirepersons:

Okay, now let's go *back here to the back. Same—first question—have you all made claims or filed lawsuits for personal injuries . . . ?*

He seems to say that the question is the "same" as the "**first question.**" Here, he is talking about claims or lawsuits for *personal injuries.*

At this point, various venirepersons responded. They mentioned five matters that were clearly personal injury claims. One person mentioned two matters that presumably were not personal injury related—a class action claim against Dillard's and a Masonite siding claim. One other person also mentioned making a claim for Masonite siding. No one at that point mentioned being a *defendant* in *any* kind of case, domestic, collection, automobile, or anything else.

Continuing to consider the context here, we note that next, at the conclusion of the foregoing questions, after addressing the various responses, counsel then seemed to summarize the nature of all of his questions:

Okay, have I overlooked anyone involved in a *claim or lawsuits for personal injuries or being defendant or having one made against you?* (There was no further response).

The question for our determination is whether counsel's intent was so clear, in context, that a reasonable venireperson in Marchant's shoes must be held to know that at that point the question was no longer about personal injury matters, but

phasis to pertinent words and phrases through the use of italics. Direct quotations

from counsel's questions are bolded.

was about all kinds of lawsuits, including collection matters.

### D. The Significance of Context

██ The reasonable interpretation of the question must be discerned from a review of the record sufficient to display the context of the question. The reasonable interpretation of the question "depends on the context of the question as well as the wording of the question." *Ewing*, 83 S.W.3d at 621; *see also Keltner*, 42 S.W.3d at 726.

The leading case in Missouri on the matter of juror nondisclosure of prior litigation experience is *Williams v. Barnes Hospital*, 736 S.W.2d 33 (Mo. banc 1987). After a judgment for the plaintiff in that case, the defendant hospital appealed, contending that several venire members did not respond truthfully to *voir dire* questions concerning prior litigation. *Id.* at 34. The Court held in that case that one juror had been guilty of intentional nondisclosure of a material matter when he failed to disclose that he had brought a personal injury action in which he had obtained a settlement. *Id.* at 38. A new trial was ordered due to the intentional nondisclosure. The Court's analysis as to the allegation of the nonresponsiveness of the other jurors is also helpful in understanding the law. In that case, plaintiff's counsel had asked whether anyone . . .

> had a lawsuit or a claim brought against him or her?
> Have any of you folks been sued?

*Id.* at 34. Counsel then stated that he was "not talking about domestic relations." *Id.* He said he was "talking about something that would involve an injury to you." *Id.* at 35.

He asked if any of "you folks ever had a lawsuit or claim brought against you?" *Id.* He asked further about "suits," "lawsuits," and "claims," whether brought against

them or against someone else by them. *Id.* He also asked again, after extensive questioning:

> Let me ask the other side of the coin. How many of you have been in the position that Barnes hospital is now in, that someone has asserted a claim against you? Are there any of you that have been defendants in an actual lawsuit?

*Id.* The question as to whether any of them had "been defendants in an actual lawsuit," isolated from its context, is entirely clear. A juror named Holloman did not mention two credit card collection actions brought against her. *Id.* at 37. She said the credit card actions did not dawn on her. *Id.* The court in *Williams* refused to isolate the question from its context in reviewing the trial court's determination that the nondisclosure in Holloman's case was unintentional. *Id.* The Court affirmed the trial court's finding. *Id.* In reaching that conclusion, the Court noted:

> the examples used by both counsel during *voir dire* consistently narrowed the focus of the questions during *voir dire* to actions involving personal injuries.

*Id.* The Court found it "understandable" that Ms. Holloman would mention a personal injury claim she brought, but would not think of the credit card actions. *Id.*

*Williams* was only the first of several cases to significantly emphasize the importance of context of the questioning in determining whether a question about litigation history was clear. *See, e.g., Wingate*, 853 S.W.2d 912; *Payne*, 177 S.W.3d 820; *Ewing*, 83 S.W.3d 617; and *Keltner*, 42 S.W.3d 716.

In *Ewing*, the plaintiff appealed from the denial of a motion for new trial on grounds of juror nondisclosure. 83 S.W.3d at 620. In that case, the panel members

were asked whether any of them or a family member had "been involved in an automobile accident that caused some serious injuries." *Id.* at 619. A panel member named Cesar did not respond, and ended up serving on the jury. *Id.* at 620. It was later discovered that Cesar's son had been involved in an accident in which there were fatalities and serious injuries, though Cesar's son had not been injured. *Id.* The question, considered in isolation, was obviously entirely clear. The court in *Ewing* noted, however, that the *context* of the question was one in which Cesar could reasonably have thought counsel was seeking to know about accidents in which serious injuries were suffered by venire members or members of their families (rather than by other persons). *Id.* at 621. The court held that because the question was "not clear" *in its context*, the failure of Cesar to mention his son's accident "did not constitute an intentional or unintentional nondisclosure." *Id.* at 622. *Ewing* demonstrates the significance of context in interpreting the reasonable meaning of a question and illustrates that a question cannot be considered in isolation from the other questions asked.

In *Payne*, 177 S.W.3d 820, the court was faced with a scenario similar to the one before us. Counsel asked a question about whether any of the venire had "been a party to a lawsuit." The context was as follows:

> Any of you been a party to a lawsuit? Whether you had a claim for injury or you may have been sued for an injury?

*Id.* at 841. Then there was discussion with venire members about "accidents" and "claims," and counsel asked: "anybody involved in an accident?" *Id.* Then, a little later, counsel asked:

> [A]nyone else, prior claim, prior lawsuit?

*Id.* After more discussion about accidents, counsel then asked:

> [I]s there anyone else here who, since it was asked previously, recalls that you have been involved in some type of claim which you have sought money from another person or an individual or from a company?

*Id.* at 841–42. Counsel then closed with another question about "personal injuries or monetary damages." *Id.* at 842. After the verdict, counsel sought a new trial for intentional nondisclosure. The reviewing court, examining the *entire context,* determined that it was reasonable for the jurors to have assumed the questions were solely regarding injury claims. *Id.* at 843.

Here, also, after early comments about personal injury matters, there was never a definitive statement broadening the scope of the inquiry. Also, as in *Payne,* the final question seemed to represent a summary (to see if anything had been overlooked) of what had gone before—and it was clearly limited to personal injury matters.

In this case, the context was extensively involved with questions about personal injury litigation and claims. Appellants now seek to separate the question about "being a defendant" from its context of personal injury claims. Under the law, we cannot do that.

Appellants also show that they are willing to consider context, when it helps their arguments. Here, they argue that because counsel did not discourage the venire members from mentioning the Masonite siding claims, which were not personal injury claims, this showed to the venire that counsel was interested in any kind of litigation. It may be true that this particular part of the context tends to suggest that a reasonable venireperson *could* have believed that counsel was interested in all kinds of litigation. But it does not show

that in the total context the question was *so clear* that every reasonable venire member *would* have believed that counsel wanted to know about all kinds of litigation. In spite of the fact that counsel did not discourage people from mentioning the Masonite claims, counsel simply did not make clear that he wanted to know about all kinds of litigation. Noticeably lacking is any statement from counsel that he was talking about *all* kinds of claims, such as specifying that he meant to include, for instance, domestic, contract, business, credit card, landlord-tenant, small claims, and neighborhood disputes, just to give some examples.

The duty of counsel to show that the question was clear is not satisfied when some venire members could reasonably think one thing, and some other venire members could reasonably think the opposite. If the record shows that the question was not clear in the total applicable context, the risk of lack of clarity should fall on the party framing the question, not the opposing party. *See Ewing,* 83 S.W.3d at 622 (suggesting greater care in the posing of questions).

Although we review this matter *de novo,* we agree with the trial court that a venireperson could reasonably have understood that counsel was asking exclusively about injury claims. We do not agree with appellants that a reasonable venireperson would have understood that counsel's intention was to ask about *all kinds of claims and cases.*

This case clearly is not like *Nadolski v. Ahmed,* 142 S.W.3d 755, 765 (Mo.App. 2004), where the juror withheld information about a personal injury claim that had been brought and settled by her husband, where the question was: "Has anyone on the panel or any member of your immediate family brought an action against anybody else, for personal injury or wrongful

death?" No issue was raised on appeal about the context creating any confusion. The question was specific. It was clearly about personal injury or wrongful death. The only quibble about meaning was whether the word "anybody" would be understood to include a corporation. *Id.* In this case, in contrast, the question, limited to its own terms, was general, but in context could be reasonably understood as referring to personal injury.

This case also is not like *Massey v. Carter,* 238 S.W.3d 198, 201 (Mo.App.2007), where the attorney asked generally, "Have any of you ever filed a lawsuit?" After a venireperson mentioned filing a claim "as a homeowner," and after finding out the venireperson was satisfied with how things were resolved in that case, counsel then asked, "Have any of you ever been sued by anyone?" *Id.* The juror in question failed to disclose he had been sued five times in collection lawsuits. *Id.* at 200. The court in *Massey* pointed out that, after the question about having been "sued by anyone," there were no follow-up questions "honing in" on a specific kind of lawsuits, as there was in *Payne. Id.* at 201. The court said that therefore the question "remained a general question." *Id.*

This case is also not like *Brines v. Cibis,* 882 S.W.2d 138, 139 (Mo. banc 1994), where a juror failed to disclose he had been sued eight times in collection matters after the judge, in *voir dire,* had inquired, "do we have anyone on the panel who is now or ever has been a defendant in a lawsuit?" In *Brines,* there is no indication that anything in the context might have confused the juror. The Court saw the question as straightforward, and devoted no attention to context, although we know from *Williams* that the Court would have considered context if it were pertinent. *Williams,* 736 S.W.2d at 37. The lack of comment on context in *Brines,* which cited

and relied upon *Williams,* can only be due to the fact that in *Brines,* unlike the present case, there was no confusion arising from the context.

Thus, we fail to find any authority dictating that we reverse the trial court in this case. The authority is to the contrary. The trial court correctly ruled that counsel's intent was not clearly expressed.

For all the foregoing reasons, we deny Point I.

## II. Dr. Lairmore's "Personal Standard" Testimony

■ In their second point, appellants claim that the trial court erred in excluding certain deposition excerpts of defense expert Dr. Lairmore, which they believe would have impeached his testimony on the applicable standard of care.

■ In a medical malpractice action, the plaintiff must prove that the defendant failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and that his actions caused the plaintiff's injury. *Coon v. Dryden,* 46 S.W.3d 81, 90 (Mo.App.2001).

During trial, excerpts from the depositions of the parties' expert witnesses were read into evidence. Appellants proposed to read from the deposition of Dr. Lairmore, who offered his view that the medical providers in this case conducted treatment in a manner commensurate with the degree of skill and care used under the same or similar circumstances by members of the defendants' profession.

On cross-examination in the deposition, Dr. Lairmore said,

It's possible that I would have taken—made different moves at different points of the diagnostic dilemmas that were presented. Yes.... Would I have possibly ordered slightly different tests or intervened at a different time interval? I think it's fair to say that I might well have.

....

It's possible I would have intervened earlier. Yes.... If you're asking me if is it possible that I would have wound up operating on her sooner, the answer is yes, it's possible I would have.

....

I think, as I tried to say before, that it would have been a result of a constellation of findings and not one single test, and so it would require me to speculate what I would have done at that particular time.

I think it's possible I would have taken the patient back earlier.

....

I don't know if I can form opinions as to an exact date in time that that suspicion [of sepsis] should have been highest. I have testified that I may have taken this patient to the operating room sooner, and I have testified that I think it should have been a high suspicion all along.

Plaintiffs offered to read these excerpts to the jury. The trial court excluded the evidence in response to the objection of the respondent doctors that the witness's own personal standard of care was irrelevant. Appellants now claim that the trial court should have permitted them to read these excerpts from Dr. Lairmore's deposition in order to impeach his credibility after he testified that respondents' actions met the standard of care.

■ Our review of an alleged error in the admission or exclusion of evidence is limited to whether the trial court abused its discretion in admitting or excluding the evidence. *Aliff v. Cody,* 26 S.W.3d 309, 314 (Mo.App.2000). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then

before the court and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.* at 315. If reasonable people can differ about the propriety of the action taken by the trial court, it cannot be said that the court abused its discretion. *Id.*

At trial, respondents' counsel objected to the introduction of these portions of Dr. Lairmore's deposition testimony, stating that Dr. Lairmore's personal standard was not relevant to determining the standard of care. In response, appellants' counsel argued as follows:

> My response is, he [Dr. Lairmore] never answers any of these questions, for one. And the second response is that, you're right, that we're not offering this [as] standard of care testimony. And, in fact, I recognize in my question on page 58 that he believes that Dr. Cameron's decision to wait was not below the standard.
>
> However, the personal experience of an expert witness, who [has] the same and like qualifications as the expert—I mean as the witness he's testifying for [—] is admissible. It's admissible as foundation, it's admissible to explain the witness's testimony. It has—there is nothing inadmissible about it in terms of being prejudicial or anything else. I'm not offering this as comments on the standard of care, and I make clear that isn't standard of care stuff.

The foregoing remarks are not entirely clear. They suggest that appellants are conceding that they cannot use Dr. Lairmore's personal practices to establish what the standard of care is, but they can use the deposition excerpts as to what he thinks he might have done differently to try to cast doubt on the reliability of the foundation of Dr. Lairmore's opinion as to the standard of care. In other words, although the plaintiffs did not use the word "impeachment" or "credibility," this is what they really had in mind. And that is their argument on this appeal. The reason to ask about the foundation of the witness's testimony would be to cross-examine the witness on how the witness arrived at the conclusion that the defendants' practice was within the standard of care, if the witness thinks he might "possibly" have done it differently. It would be inquiring as to how the witness holds to his position on the standard of care if his personal practice might "possibly" be different. And it would be asking about what circumstances would make his personal approach different.

It might not have been immediately clear to the trial judge that this was the nature of the offer. In any event, there was no explanation given to the court how merely pointing out that the witness might "possibly" have done it differently would, *in itself,* impeach the witness or attack the foundation of his conclusion concerning the applicable standard of care. Here we were dealing with deposition excerpts, not live testimony, so there was no opportunity to demonstrate a contradiction of the witness with his own opinion. Even as deposition testimony, if the witness had admitted that, given the same circumstances, he *would have* done it differently, there would have been a stronger argument that this was to some extent a potential impeachment of the foundation of the physician's opinion. But, here, there was no clear link between the acknowledgment that the witness might "possibly" have done it differently and the impeachment of the foundation of the doctor's opinion. It simply was not clear from the comments of plaintiffs' counsel that the admission of these excerpts would serve to attack the doctor's credibility in a meaningful way that would be helpful to the jury. Thus, we do not need to decide directly in this case wheth-

er such an approach is, as a general proposition, a permissible method of impeaching a physician's testimony as to the standard of care.

██ The trial court is in the best position to determine whether the offered testimony will help explain a witness's testimony, relate to the foundation of the witness's opinion, or merely confuse the jury. *See Nguyen v. Haworth,* 916 S.W.2d 887, 889 (Mo.App.1996) ("The trial judge sits as an intimate observer and is in the best position to determine the effect admission of evidence has upon the case."). Based upon the arguments made before it, the trial court evidently decided that the testimony was not admissible for the purposes mentioned in the appellant's response to the objection. We find no error in the decision of the trial court for the reasons given. Because it did not directly impeach the doctor's opinion, it is not necessary for us to reach the issue of whether "personal standard" testimony may be used to impeach an expert's credibility as to the applicable standard of care. Point denied.

### III. Testimony of Dr. Salzman

██ In their final point, appellants claim that the trial court erred when it allowed Dr. Gary Salzman's testimony as to the cause of Mrs. McBurney's death. As previously stated, we review the trial court's admission of evidence for an abuse of discretion. *Aliff,* 26 S.W.3d at 314.

Two possible causes of Mrs. McBurney's death were theorized at trial. The first was abdominal infection secondary to surgical bowel injury, and the other was sequelae of pneumonia caused by aspiration (inhaling of vomitus). The second cause could provide no relief to appellants as it would demonstrate that any negligence on the part of the respondents was not the operative cause of death. Respondents put forth at trial an expert, Dr. Salzman, who acknowledged that he did not have the expertise to evaluate the issues related to Mrs. McBurney's abdomen and bowel injuries. Instead, he was present only to opine on the sequelae of aspiration pneumonia, an area within his expertise. He testified that in his opinion the aspiration pneumonia caused the sepsis, and that the pneumonia and the sepsis with multi-system organ failure caused her death.

Appellants argue that Dr. Salzman's opinion of the cause of Mrs. McBurney's death could not be given to a reasonable degree of medical certainty because he had no ability to evaluate the abdominal theory. In other words, appellants argue that because Dr. Salzman could not rule out the possibility that the bowel leak caused sepsis which caused Mrs. McBurney's death, he did not have the ability to state that the aspiration was the cause of sepsis and death to a reasonable degree of medical certainty. The question here is not whether the limitations of his expertise weakened the force and weight of his opinion in the face of an opposing opinion. If that were the question, the answer would be yes, it does in fact weaken the weight of his opinion. That argument is very appropriately made to the fact finder. The question here, though, is whether the limitations of his expertise rendered his opinion *inadmissible* on grounds that it would tend to seriously mislead or confuse the jury.

██ Because medicine is highly specialized, it would seem to us that it is not unusual for a physician to testify only within the sphere of that physician's particular expertise as to causation factors. To establish causation, the plaintiff must prove that the defendant's conduct was both the cause in fact and the proximate, or legal, cause of the plaintiff's injury. *Coon,* 46 S.W.3d at 90. To establish cause

in fact, the plaintiff must show that the injury would not have occurred but for the conduct of the defendant. *Id.* To show proximate case, the injury must be the natural and probable consequence of the defendant's negligence. *Id.*

Dr. Salzman testified that Mrs. McBurney died of sepsis resulting from aspiration pneumonia as the major factor. He did not purport to evaluate the bowel condition. In doing so, Dr. Salzman was, in effect, undermining the "but for" causation that the appellants were attempting to prove with regard to the bowel leakage.

Appellants argue that because of Dr. Salzman's lack of expertise with regard to the bowel conditions, we should declare *as a matter of law* that he could not achieve reasonable medical certainty in his opinion of cause of death, and, thus, his opinion should have been excluded. Appellants have provided us no authority supporting the notion that an expert must rule out other potential causes of death in order to be able to state within a reasonable degree of medical certainty what his or her conclusion is as to cause of death.

██ It is true, of course, that expert medical testimony must be given to a reasonable degree of medical certainty. *Tompkins v. Cervantes,* 917 S.W.2d 186, 189 (Mo.App.1996); *see Williams v. Daus,* 114 S.W.3d 351, 363 (Mo.App.2003). We cannot say as a matter of law, however, that Dr. Salzman could not present such an opinion in this case because of the lack of expertise concerning bowel conditions. The validity of Dr. Salzman's opinion remained for the jury to determine in light of all the evidence.

We hold that the trial court did not abuse its discretion in allowing the testimony of Dr. Salzman about the cause of Mrs. McBurney's death. Point denied.

## Conclusion

For all of the foregoing reasons, the judgment is affirmed.

HOWARD, SPINDEN, NEWTON, and HARDWICK, JJ., concur.

ELLIS, J., concurs in separate opinion.

LOWENSTEIN, J. dissents in separate opinion.

BRECKENRIDGE and HOLLIGER, JJ., recuse.

JOSEPH M. ELLIS, Judge, concurring.

On the juror disclosure issue, I concur only in the result reached. I do so because I cannot say with any certainty that the questions were sufficiently clear that a reasonable juror might not have perceived that they were only about personal injury claims, as found by the trial court. Unlike in *Bell v. Sabates,* 90 S.W.3d 116 (Mo.App. W.D.2002), where "there was a common understanding among the venire that the discussion went to claims and lawsuits," *id.* at 122, the record before us in the instant appeal does not compel the conclusion that a reasonable juror could not have misunderstood that the inquiry was about "**all claims and lawsuits**" as opposed to only those involving personal injuries.

On the other issues presented on appeal, I concur in the majority opinion.

HAROLD L. LOWENSTEIN, Judge, dissenting.

I respectfully dissent and would reverse and remand the case for a new trial. Ordering a new trial because of an intentional nondisclosure of a venireperson is indeed a drastic remedy. But, during jury selection where there has been a nondisclosure, that is deemed intentional, bias and prejudice are normally presumed to have influenced the verdict. *Nadolski v. Ahmed,* 142 S.W.3d 755, 764 (Mo.App.2004). I believe

such a result is warranted here because of the failure of the eventual foreperson of the jury to disclose that he had been sued by three creditors, and personally served as a named defendant, all for unpaid debts of his and his parents' business.

A "nondisclosure" occurs when a clear question unequivocally triggers the venireperson's response (would a lay person reasonably conclude the undisclosed information) that had been solicited by the question. *Keltner v. K–Mart,* 42 S.W.3d 716, 723 (Mo.App.2001). That issue is reviewed *de novo.*

If it is determined by the court there was a nondisclosure, the party seeking a new trial must show this failure to answer the clear question was "intentional," that the venireperson has no reasonable inability to understand the question and either remembers the experience, or the significance of purported forgetfulness is unreasonable. *Redfield v. Beverly Health and Rehabilitation Services, Inc.,* 42 S.W.3d 703, 708 (Mo.App.2001). This question is reviewed for an abuse of discretion, but here, that standard is inapplicable since the trial court denied the motion for a new trial, finding that the first prong, nondisclosure, had not been met.

It is my belief that no matter how this question, "Anyone else ever had—been a defendant in a claim or a lawsuit or members of your immediate family, other than what we've just talked about?" was clogged between other questions related to personal injury suits—to this specific question, its answer could not be avoided because of context. The fact that no other member of the venire answered this particular question does not bolster the conclusion that no one understood this question. It is just as logical to assume no other venireperson, or a member of his or her family, had been sued. (Apparently, a check of the plaintiff-defendant records

netted no other juror names.) The scenario here is akin to a recent decision of this court in which a new trial was ordered where counsel, after inquiring about lawsuits filed by venirepersons then asked, "Have any of you ever been sued by anyone?" *Massey v. Carter,* 238 S.W.3d 198, 202 (Mo.App.2007). No doubt, the question in the case at bar could have been better posed, and contained in a context isolated from other questions, but the question here was clearly asked and not masked by context.

If the question here was clear, the next prong to be addressed is whether the nondisclosure was intentional. As this court said in *Hatfield v. Griffin,* 147 S.W.3d 115, 119 (Mo.App.2004), it was unreasonable that the venireperson could have forgotten or that it "did not enter her mind" that she had been sued where he was made a defendant and served in a suit for unpaid medical bills. The Supreme Court in *Brines v. Cibis,* 882 S.W.2d 138, 140 (Mo. banc 1994) has said, "questions and answers pertaining to a prospective juror's prior litigation experience are material." The transcript of the new trial motion discloses the venireperson had no trouble remembering the lawsuits, so the failure to disclose was unreasonable and, therefore, intentional. *Williams,* supra 736 S.W.2d at 38.

It is counsel's duty in jury selection to make clear, concise questions. In order for there to be a fair and impartial jury to decide factual issues, the venirepersons must also be encouraged to disclose matters that would impair or cloud their ability to decide fairly.

I would reverse the denial of the new trial motion and would remand for a new trial.