

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101551 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Francois County |
| vs. | ) | 10WA-CR00247-02 |
| | ) | |
| NANETTE SUE LITHERLAND, | ) | Honorable Kenneth Wayne Pratte |
| | ) | |
| Appellant. | ) | Filed:  September 29, 2015 |

Nanette Sue Litherland ("Defendant") appeals the judgment entered upon a jury verdict convicting her of first-degree assault with respect to the shooting of her father-in-law James Litherland ("James Litherland" or "James")[1] and first-degree murder with respect to the shooting and death of her husband Jerry Litherland ("Jerry Litherland" or "Jerry").  We reverse and remand for a new trial.

### I.    BACKGROUND

On September 22, 2009, an officer with the Washington County Sheriff's Office was dispatched to the Litherland family farm because a shooting had taken place.  When the officer arrived, he found James Litherland being treated by emergency personnel for a gunshot wound to the back of his head.  After finding blood on the property, the officer believed James had been shot on the premises.

---

[1] Because many of the parties involved in this case are family members who share the same last name, we will often refer to them by their first names for clarity and ease of reading.  No disrespect is intended.

On November 8, 2009, three officers with the Missouri State Highway Patrol responded to another crime scene at the Litherland family farm. The officers found Jerry Litherland dead on the property, and the cause of death was later determined to be multiple gunshot wounds to the chest.

Subsequently, Defendant was charged with first-degree assault for acting knowingly in concert with another or others to cause serious injury to James Litherland by aiding or encouraging Jacob Feldman ("Jacob Feldman" or "Feldman") to shoot James. Defendant was also charged with first-degree murder for acting knowingly in concert with another or others to cause the death of Jerry Litherland by aiding or encouraging Jacob Feldman to shoot Jerry. Although Defendant was initially charged in the Circuit Court of Washington County, Defendant filed a motion for change of venue. The motion was granted and the case was transferred to the Circuit Court of St. Francois County, where a jury trial took place from June 10-11, 2013.

At the time James Litherland was shot and Jerry Litherland was shot and killed, Defendant and Jerry were married but separated. M.L. was the daughter of Defendant and Jerry Litherland. Defendant and M.L. lived together in a separate residence, while Jerry lived with his father James on the Litherland family farm. Feldman, a friend of M.L.'s and the person who shot James and shot and killed Jerry, also lived on the Litherland family farm. One of the State's key witnesses, Gwen Buhler ("Gwen Buhler" or "Gwen"), was married to Defendant's son Thomas Buhler ("Thomas Buhler" or "Thomas") at the time the crimes took place.

At the time of Defendant's trial, Jacob Feldman was incarcerated for first-degree murder for the shooting and death of Jerry, having previously pled guilty to the crime. The State and the defense do not dispute the evidence at trial demonstrated Jacob Feldman shot James on September 22, 2009 in the back of the head with the intent to kill and that Feldman caused Jerry's death by shooting him on November 8, 2009. However, the State and the defense do dispute whether the evidence at trial demonstrated Defendant was involved in those crimes, i.e., whether Defendant

2

aided or encouraged Jacob Feldman to shoot James or aided and encouraged Feldman to cause the death of Jerry by shooting Jerry.

## A. Defendant's Pre-Trial Motion for a Continuance

Prior to voir dire, the trial court held a pre-trial conference. The very first matter, raised by defense counsel, was an oral motion for a continuance. When defense counsel told the court he was going to make a motion for a continuance, and before counsel even told the court the basis of the motion, the court stated, ". . . I'm going to go ballistic." Defense counsel then explained to the court that the only witness for the defense, M.L. (who was a possibly intimate friend of Feldman, the person who shot and killed Jerry and shot James; the daughter of both the Defendant and Jerry, the murder victim; the granddaughter of the assault victim, James; and the sister-in-law of Gwen Buhler, a key witness for the State), was temporarily unavailable to testify because M.L. went into labor.

Defense counsel told the court M.L. went into the hospital "today . . . at 3:00 a.m." to give birth and would be in the hospital for three days (exceeding the duration of the two-day trial) because of a condition called toxemia pre-eclampsia which resulted in M.L. "going early" into labor. Counsel further stated, "[M.L.] literally is our only witness" and "we believe we can convince the jury that [Defendant] did not commit these offenses . . . [b]ut [we] do need this witness."

Defense counsel explained to the court the State's theory of the case which was that the Litherland family farm was "in dire straights economically," and Defendant orchestrated a conspiracy for Jacob Feldman to kill Jerry and then use proceeds from Jerry's life insurance benefits to pay debt owed on the farm. Counsel argued M.L.'s testimony could support an alternative theory that Feldman had a motive of his own to kill Jerry, because Feldman was in love with M.L. and in a relationship with her. According to defense counsel, M.L. had a journal which indicated she was in

3

love with Feldman, and M.L. would provide important testimony that Defendant wanted to rekindle her marriage with M.L.'s father Jerry, which would rebut the State's argument that Defendant killed Jerry to obtain money from his life insurance benefits. Counsel also argued M.L.'s testimony would contradict Gwen Buhler's testimony at trial that she overheard incriminating conversations involving Defendant. Finally, defense counsel told the court that although he previously took M.L.'s deposition, it would be an inadequate substitute for her live testimony because with a deposition the jury would not be apprised of M.L.'s "non-verbals."

In response to Defendant's motion for a continuance, the State conceded that M.L.'s deposition, which was taken just over a week before trial, could be used at trial if it conformed to the rules of evidence. However, the State objected to a continuance of the trial, expressing concerns that the case was three and one-half years old and stating, "[we] got a family that's been waiting for justice for a long time." The State also argued, "we have . . . for the last nine months been aware as a possibility that [M.L.], who may be the only witness for the defense, maybe [sic] under this condition."

The trial court denied Defendant's motion for a continuance, stating only, "It should have been pretty obvious to everybody, [at M.L.'s] late deposition, that you might have to rely on that. That with [M.L.'s] condition, you never know. We're going to try this case."

## B. Defendant's Jury Trial

Defendant did not testify or present any evidence at her jury trial. The State called eleven witnesses,[2] with Gwen Buhler and Jacob Feldman providing the bulk of the testimony presented at Defendant's trial.[3] In addition to calling Jacob Feldman as a prosecution witness during the trial,

---

[2] The State's eleven witnesses consisted of five officers who had investigated the crimes; a 911 dispatcher; two of Feldman's friends; Gwen and Thomas Buhlers' neighbor; Gwen Buhler; and Jacob Feldman.
[3] Gwen and Feldman's testimony at trial combined accounted for more than 60% of the approximately 349 pages of total testimony in the transcript; Gwen's testimony is set forth in approximately eighty pages of the transcript, and Feldman's testimony is set forth in approximately 133 pages of the transcript.

4

the State also played for the jury over ninety-nine minutes of videotaped excerpts of an interview Feldman had with police and videotaped excerpts of a proffer made by Feldman. Feldman stated in his proffer that he was testifying against Defendant in exchange for the State not pursuing the death penalty against Feldman for his role in Jerry's murder.

1. **The State's Theory Regarding the Shooting of James Litherland**

With respect to the shooting of James Litherland, the State's theory at trial was that Defendant encouraged Feldman to shoot James by telling him James had been molesting M.L. (who was Defendant's daughter, Feldman's friend, and James' granddaughter). The State argued in closing argument that "[the] molestation stories . . . were fake," "[Defendant] knew how much [Feldman] cared for [M.L.], so what better way to press the buttons," and "[Defendant] encouraged him to do the [shooting] by feeding [Feldman] these fake stories." The State's theory regarding Defendant's involvement in the shooting of James was primarily supported by Gwen Buhler's testimony and videotaped excerpts of Feldman's interview with police and Feldman's proffer.

Gwen Buhler, Defendant's daughter-in-law, testified against Defendant in exchange for Gwen pleading guilty to a felony charge of hindering prosecution and the State recommending a sentence of probation. Gwen testified that Feldman told her Defendant wanted him to shoot James because James was "groping" and molesting M.L. Gwen also testified she had overheard Feldman and Defendant arguing after the shooting; Feldman was angry because Defendant drove him to the Litherland family farm but failed to pick him up, while Defendant was angry Feldman failed to kill James.

Jacob Feldman's videotaped interview with police and his videotaped proffer also implicated Defendant in James' shooting. Feldman stated Defendant approached him and told him he needed to kill James. Feldman also stated Defendant drove him to the Litherland family farm on

5

the day of the shooting, dropped him off knowing he was planning to kill James, and Feldman called Defendant after the shooting to let her know it was done.

## 2. The State's Theory Regarding the Shooting and Death of Jerry Litherland

With respect to the shooting and death of Jerry Litherland, the State's theory at trial was that Defendant wanted Jerry killed because Defendant was in debt and wanted to collect proceeds from Jerry's life insurance benefits. Business records were admitted at trial including a document showing Defendant owed approximately $239,000 on a mortgage at the time of Jerry's murder and a document showing Defendant sought a lump sum payment from Jerry's life insurance benefits in the amount of approximately $204,000 following Jerry's death.

According to the State's theory, Defendant encouraged Jacob Feldman to shoot and kill Jerry by offering him money she would receive from Jerry's life insurance benefits and by telling Feldman that Jerry had been molesting M.L. As with the allegations that James Litherland was molesting M.L., the State argued to the jury that "[the] molestation stories [involving Jerry] . . . were fake," "[Defendant] knew how much [Feldman] cared for [M.L.], so what better way to press the buttons," and "[Defendant] encouraged him to do the murder[ ] by feeding [Feldman] these fake stories." The State's theory regarding Defendant's involvement in the shooting and death of Jerry was primarily supported by the testimony of two of Feldman's friends, the testimony of Gwen Buhler, and videotaped excerpts of Jacob Feldman's interview with police and Feldman's proffer.

Justin Messex, a friend of Jacob Feldman's, testified Feldman told him that Defendant was going to use life insurance benefits she would receive after Feldman killed Jerry Litherland to pay off her house and to pay Feldman for the murder. Jonathan Hand, another friend of Jacob Feldman's, testified at trial that he had a conversation with Defendant and Feldman where "they were looking for Jerry to be killed." Hand stated he was offered $10,000 to kill Jerry, it was Hand's understanding that the money would come from life insurance benefits, and he declined the offer.

6

Gwen Buhler, Defendant's daughter-in-law, testified at trial she was interviewed three or four times by the police before she was arrested for Jerry's murder, and during those interviews she never told police Defendant was responsible for Jerry's death. After Gwen was charged with Jerry's murder and was incarcerated, she told police Defendant had planned the crime. Gwen said she initially lied to police in order to protect her husband Thomas Buhler, Defendant, and Feldman.

Gwen testified at trial that a few days before Jerry's murder she overheard Defendant telling Feldman he needed to "hurry up" and "get it done" because Jerry was supposed to change the beneficiaries on his life insurance policy. Gwen also stated she overheard Defendant tell Feldman she would "take care of him" if he got caught. Gwen testified Defendant had told Feldman and others that Jerry was molesting M.L., but Gwen later learned the molestation claims were untrue. Gwen also stated she overheard Feldman say Defendant wanted him to shoot and kill Jerry, and Feldman also said he was going to shoot Jerry because Defendant "told him about all the things that Jerry was doing to [M.L.]."

Gwen also testified Defendant and Jacob Feldman decided Gwen's husband Thomas would drive Feldman in their neighbor's car to the Litherland family farm where they planned for Feldman to shoot and kill Jerry. Gwen testified that on the day of Jerry's murder she saw Feldman get into the car with Thomas' .22 rifle, observed Thomas leave with Feldman, and then saw Thomas return home alone. Gwen stated Thomas subsequently received a telephone call, and Thomas left the house again and returned with Feldman.

Jacob Feldman's videotaped interview with police and his videotaped proffer also implicated Defendant in Jerry's murder. Feldman stated Defendant approached him, Defendant told Feldman he needed to kill Jerry, and Defendant told Feldman she would give him insurance money if he did. Feldman said he told Defendant it was her decision whether she wanted Jerry killed, and Defendant told Feldman to kill Jerry but she did not want to know how it was done. Feldman stated

7

Thomas and Gwen also knew about the murder, Feldman took Thomas' .22 rifle to the Litherland family farm, and Thomas drove him there to kill Jerry. Feldman said that when he arrived at the farm, it was too dark to use Thomas' gun, so Defendant found another rifle in the house and used it to shoot and kill Jerry.

###   3.   The Defense Theory with Respect to Both Crimes

The defense theory at trial was that Defendant had no involvement in James' shooting or Jerry's murder and Feldman shot James and killed Jerry on his own. In support of its theory, the defense relied on Jacob Feldman's trial testimony and argued the State's witnesses were not credible.

Although Feldman was a prosecution witness at Defendant's trial, Feldman became an adverse witness on the stand and recanted his previous statements from his videotaped interview with police and his videotaped proffer which implicated Defendant in James' shooting and Jerry's murder. Feldman testified at trial he was not telling the truth when he implicated Defendant in his videotaped interview with police and in his proffer and "thought that that [sic] was a way of saving of [sic] my own life."

Feldman testified at trial that Defendant never asked him to kill James, and Feldman said he shot James on his own because James touched M.L. inappropriately on multiple occasions and because Feldman loved M.L. Feldman also testified Defendant never asked or encouraged him to kill Jerry and Defendant did not offer Feldman money to kill Jerry. Feldman stated he killed Jerry on his own out of love and respect for M.L., because of how Jerry treated and threatened M.L. Feldman testified that on the night of the murder, Thomas Buhler had driven him to the Litherland family farm so Feldman could get some drugs. Once Feldman got there, he waited for Jerry to come home, and when Jerry arrived, Feldman confronted Jerry about what he was doing to M.L.

8

Feldman testified he told Jerry to get his things and leave, and Jerry responded in a way which prompted Feldman to shoot and kill Jerry.

Feldman testified at trial it was not true he confided in Justin Messex about the murder and denied he told Messex Defendant had offered him money to kill Jerry or that Defendant would get life insurance benefits if Jerry was killed. Feldman also stated it was not true he and Defendant tried to hire Jonathan Hand to murder Jerry or that they offered him life insurance money. Feldman stated he had asked Hand, a friend who would do whatever Feldman asked, to testify to those things to corroborate Feldman's story in his videotaped interview and proffer and to help Feldman avoid the death penalty for killing Jerry.

At Defendant's trial, defense counsel argued the State's witnesses were not credible. The defense argued Gwen Buhler's trial testimony was not credible because, (1) Gwen admitted she gave prior inconsistent statements to the police where she did not implicate Defendant; and (2) Gwen admitted she was testifying against Defendant in exchange for a deal with the State where Gwen would plead guilty to felony hindering prosecuting and the State would recommend a sentence of probation.

## C.     Relevant Procedural Posture

After deliberating for almost three hours, the jury found Defendant guilty of first-degree assault and first-degree murder. The court entered a judgment in accordance with the jury's verdict and sentenced Defendant to life imprisonment for first-degree assault and to life imprisonment without the possibility of probation or parole for first-degree murder, with the sentences to run consecutively.

Subsequently, Defendant filed a motion for a new trial asserting the trial court erred in denying her pre-trial oral motion for a continuance based on the temporary unavailability of her sole

9

defense witness, M.L., due to M.L. going into labor on the morning of trial. After a hearing, the trial court denied Defendant's motion for a new trial. This appeal followed.

## II.    DISCUSSION

In Defendant's sole point on appeal, she asserts the trial court committed reversible error in denying her pre-trial oral motion for a continuance based on the temporary unavailability of her sole defense witness, M.L., due to M.L. going into labor on the morning of trial. For the reasons discussed below, we agree.

### A.    General Standard of Review

The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. *State v. Salter*, 250 S.W.3d 705, 712 (Mo. banc 2008). Nevertheless, whether a trial court committed reversible error in denying a motion for a continuance is determined by considering the circumstances of each case. *State v. Kauffman*, 46 S.W.2d 843, 846 (Mo. 1932); *see State v. Blocker*, 133 S.W.3d 502, 505 (Mo. banc 2004) (finding the trial court committed reversible error in denying a motion for a continuance "[u]nder the circumstances of this case"). A trial court's decision denying a motion for a continuance will be reversed only if there is a strong showing that the trial court abused its discretion and that prejudice resulted from the denial of the motion. *Salter*, 250 S.W.3d at 712.

### B.    Whether the Trial Court Abused its Discretion in Denying Defendant's Motion for a Continuance

An abuse of discretion occurs when a trial court's decision "is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Wolf*, 91 S.W.3d 636, 645 (Mo. App. W.D. 2002). "If a continuance is not likely to result in the presence of the witness at trial, the court will not be held to have abused its discretion in denying the continuance." *Blocker*, 133 S.W.3d at 504.

10

In this case, defense counsel requested a continuance based on the temporary unavailability of Defendant's sole defense witness, M.L., due to M.L. going into labor at 3:00 a.m. on the morning of trial. Defense counsel explained to the court that M.L. would be in the hospital for three days (exceeding the duration of the two-day trial) because of a condition called toxemia pre-eclampsia which resulted in M.L. "going early" into labor. Although defense counsel had taken M.L.'s deposition just over a week before trial, counsel told the court it would be an inadequate substitute for M.L.'s live testimony because with a deposition the jury would not be apprised of M.L.'s "non-verbals."

The State objected to a continuance of the trial, expressing concerns that the case was three and one-half years old and stating, "[we] got a family that's been waiting for justice for a long time." The State also argued, "we have . . . for the last nine months been aware as a possibility that [M.L.], who may be the only witness for the defense, maybe [sic] under this condition." The trial court denied Defendant's request for a continuance, stating only, "It should have been pretty obvious to everybody, [at M.L.'s] late deposition, that you might have to rely on that. That with [M.L.'s] condition, you never know. We're going to try this case."

Rule 25.13[4] permits a defendant to use a witness's deposition at trial, stating in relevant part:

> . . . [A]ny deposition obtained in accordance with Rules 25.12, 25.14 and 25.15, so far as it is otherwise admissible under the rules of evidence, *may* be used by defendant [at trial] if it appears that the witness . . . (c) [i]s unable to attend or testify because of sickness or infirmity . . . or (f) [i]s otherwise unavailable and the defendant has made a good faith effort to obtain the presence of the witness at the . . . trial, but has been unable to procure the attendance of the witness.

(emphasis added). Although Rule 25.13 provides a defendant *may* use a deposition under certain circumstances, including those in the preceding sentence, we can find no precedent requiring the use of a deposition where, as here, a defendant's sole defense witness is temporarily unavailable to testify. Similarly, this Court can find no precedent suggesting a defendant is required to proceed

---

[4] All references to Rules are to Missouri Supreme Court Rules (2015).

11

with a trial and use a witness's deposition instead of her live testimony where, as in this case, defense counsel knew his sole defense witness was pregnant at the time of her deposition, the witness went "early" into labor on the morning of trial, and the witness was expected to be out of the hospital after three days. Accordingly, to the extent the trial court's denial of a continuance was based upon the fact defense counsel had taken M.L.'s deposition before trial and knew she was pregnant at that time, the trial court's decision denying the continuance was an abuse of discretion, i.e., was clearly against the logic of the circumstances then before it and was so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *See McBurney v. Cameron*, 248 S.W.3d 36, 48 (Mo. App. W.D. 2008) (indicating that deposition testimony is different than live testimony because there is no opportunity to demonstrate a contradiction of the witness and deposition excerpts may not adequately reveal the credibility of the witness); *Wolf*, 91 S.W.3d at 645 (defining abuse of discretion).

The trial court's denial of Defendant's motion for a continuance was also an abuse of discretion because the motion was based on the temporary unavailability of a key witness for Defendant's defense against serious felony charges. Similar circumstances existed in *State v. Blocker*, 133 S.W.3d 502 (Mo. banc 2004). In that case, defense counsel learned the Sunday before the Monday trial that a key witness for defendant's defense to serious felony charges was temporarily unavailable to testify due to a family emergency. *Id*. at 503, 505. Defense counsel filed a motion for a continuance based on the temporary unavailability of the witness, the trial court denied the motion, and defendant was convicted. *Id*. at 503-04. Defendant appealed, arguing the trial court erred in denying his motion for a continuance. *Id*. at 504. The Missouri Supreme Court agreed, holding "[defendant] was entitled to a continuance until he could secure [the key witness's] testimony" and that the trial court abused its discretion in denying defendant the opportunity to introduce the evidence in support of his defense. *Id*. at 505.

12

Here, like in *Blocker*, defense counsel learned right before trial that M.L., a key witness for Defendant's defense to serious felony charges, was temporarily unavailable to testify due to a matter outside of defense counsel's control. *See id*. at 503, 505. In this case, it was undisputed M.L., Defendant's sole defense witness, went into labor at 3:00 a.m. on the morning of trial and was expected to be out of the hospital after three days.

When defense counsel told the court he was going to make a motion for a continuance, and before counsel even told the court the basis of the motion, the court stated, ". . . I'm going to go ballistic."[5] While the record does not reflect the precise reasons why the trial court was upset with counsel and counsel's motion for a continuance before the court even heard the basis of the motion, the trial court may have shared the State's concerns that the case was three and one-half years old and that the victims' family had "been waiting for justice for a long time."

This Court recognizes the importance of cases being decided as efficiently as possible and the importance of justice being served to victims, their families, and society as a whole. However, those principles should not override a defendant's constitutional right to present a defense, *see Crane v. Kentucky*, 476 U.S. 683, 690 (1986), especially in a case such as this where a defendant is defending a charge of first-degree murder subject to a sentence of life imprisonment without the possibility of probation or parole. *See* section 565.020.2 RSMo 2000 (discussing the mandatory punishment for first-degree murder). "[C]ourt[s] *must remember* that one of the fundamental rights of due process afforded to a defendant is the right to present witnesses in his defense." *State v. Simonton*, 49 S.W.3d 766, 781 (Mo. App. W.D. 2001) (emphasis added) (quotations omitted).

---

[5] The trial court's statement ". . . I'm going to go ballistic," made by the court before it even heard the basis of Defendant's motion for a continuance, is concerning because it indicates the trial court may have had a predisposition to rule against Defendant regardless of the merits of Defendant's motion. In light of the context of the trial court's statement, this Court is compelled to emphasize it is necessary for courts to consider the merits of parties' arguments before ruling on an issue.

13

Here, the trial court denied Defendant's motion for a continuance although M.L., Defendant's sole defense witness to serious felony charges, went into labor at 3:00 a.m. on the morning of trial and was expected to be out of the hospital after three days. We find that under these circumstances, Defendant was denied her constitutional right to present witnesses in her defense, "[Defendant] was entitled to a continuance until [s]he could secure [M.L.'s] testimony," and the trial court abused its discretion in denying Defendant the opportunity to introduce M.L.'s testimony in support of her defense. *Blocker*, 133 S.W.3d at 505.

### C. Whether Defendant Was Prejudiced By the Denial of Her Motion for a Continuance

In order to find the trial court committed reversible error in denying Defendant's motion for a continuance, we must also find Defendant was prejudiced as a result of the trial court's ruling. *Salter*, 250 S.W.3d at 712. Here, the State does not dispute M.L. would have testified as defense counsel claimed at the pre-trial hearing on the motion for a continuance and M.L.'s testimony would, (1) indicate she was in love with Feldman; (2) provide Defendant wanted to rekindle her marriage to M.L.'s father Jerry; and (3) contradict Gwen Buhler's testimony at trial that she overheard incriminating conversations involving Defendant.

The State argues Defendant suffered no prejudice from the trial court's denial of her motion for a continuance because M.L.'s proposed testimony regarding her relationship with Feldman and regarding Defendant's feelings towards Jerry was merely cumulative to testimony of witnesses for the prosecution. The State cites to portions of the trial transcript where, (1) various witnesses for the State testified Feldman was in love with M.L. and that Feldman believed M.L. was being molested; (2) one State witness testified Feldman told him he shot James because James had made sexual comments or had done things to M.L.; and (3) one of the officers investigating the case testified for the State that Defendant told him she still loved her husband Jerry and wanted to get back together with him.

14

Courts have found no prejudicial error results from the denial of motion for a continuance based on the unavailability a defense witness where the witness's testimony *would have been cumulative to that of another defense witness*. *See, e.g., State v. Morin*, 873 S.W.2d 858, 871 (Mo. App. S.D. 1994); *State v. Martin*, 515 S.W.2d 802, 803-04 (Mo. App. 1974). Those are not the circumstances present in this case, however, and we reject the State's contention that Defendant suffered no prejudice from not being able to present testimony from her only defense witness because some of the testimony *may have been cumulative to that of witnesses for the prosecution*.

Instead, we find Defendant was prejudiced by not being allowed to secure M.L.'s testimony at Defendant's trial because M.L. was a vital witness whose testimony could have been more significant than testimony from witnesses for the prosecution, and because M.L.'s testimony could have affected the outcome of the case. *See Simonton*, 49 S.W.3d at 783-85 (finding defendant was prejudiced from the exclusion of a doctor's testimony even though it may have been cumulative to that of another doctor because the excluded witness's testimony was more significant and could have affected the outcome of the case). M.L. was a vital witness not only because she was the only witness for the defense, but also because she was in the unique position of having relationships with all of the principal players involved in this case – she was a possibly intimate friend of Feldman, the person who shot and killed Jerry and shot James; the daughter of both the Defendant and Jerry, the murder victim; the granddaughter of the assault victim, James; and the sister-in-law of Gwen Buhler, a key witness for the State. In addition, she was the only member of her family who was not allegedly involved in her father's murder or who was not a victim. As previously discussed, it is undisputed M.L. was temporarily unavailable to testify because she went into labor at 3:00 a.m. on the morning of trial and was expected to be out of the hospital after three days. Prejudice from the denial of a continuance or recess "usually occurs in a situation where a vital witness is temporarily unavailable." *State v. Wilson*, 732 S.W.2d 186, 188 (Mo. App. W.D. 1987).

15

M.L.'s testimony could have affected the outcome of the case because it involved and could affect important jury questions which related to the State's ability to prove its case; specifically, her testimony could have a direct bearing on the issues of motive and whether Defendant was involved in incriminating conversations about the crimes. *See Blocker*, 133 S.W.3d at 504, 505 (implicitly finding defendant was prejudiced by the denial of a motion for a continuance based on temporary unavailability of a witness where witness's testimony involved and could affect jury questions which related to the State's ability to prove its case). If Defendant was allowed to secure M.L.'s testimony at trial, M.L. could have testified as to specific details of her relationship with Feldman and whether she was molested by James and/or Jerry. This could have shed light on whether, according to the defense, Feldman had a motive of his own to shoot James and shoot and kill Jerry which was based on fact, or, as contended by the State, Defendant aided or encouraged Feldman to commit the crimes by feeding Feldman false stories about M.L. being molested by James and Jerry Litherland. Additionally, M.L.'s testimony that Defendant wanted to rekindle her marriage with M.L.'s father Jerry could potentially rebut the State's theory that Defendant aided or encouraged Feldman to kill Jerry to obtain money from his life insurance benefits.

With respect to the potential impact of M.L.'s testimony on testimony from Gwen Buhler that Defendant was involved in incriminating conversations regarding James' shooting and Jerry's murder, we find M.L.'s testimony would not merely impeach Gwen's testimony but instead bear directly on the guilt or innocence of Defendant. *Cf. State v. Brown*, 762 S.W.2d 471, 475 (Mo. App. E.D. 1998) ("[w]here testimony of an absent witness would not bear directly on the guilt or innocence of a defendant, but would simply impeach the testimony of another witness, it is not error to deny a continuance"). Gwen's testimony was a significant part of the State's case because she was the only member of Defendant's family who testified at trial, Gwen implicated Defendant in the crimes, and Gwen claimed she and Defendant were both involved in Jerry's murder. However,

16

Gwen, like Jacob Feldman, gave inconsistent statements about whether Defendant was involved in James' shooting and Jerry's murder and only implicated Defendant in exchange for deals with the State. Because of the issues relating to Gwen's credibility at trial and because M.L. was such a vital witness, we find M.L.'s testimony contradicting Gwen Buhler's testimony that she overheard incriminating conversations involving Defendant could have affected the outcome of the case.

Based on the foregoing potential impact of M.L.'s testimony at trial, we find Defendant was prejudiced by the denial of her motion for a continuance based on the temporary unavailability of M.L. as a witness.

**D.     Conclusion**

While this Court is mindful of the delay in justice to all parties associated with this case, considering many years have passed since the commission of the underlying crimes, it should be noted that a one-week continuance of the trial date would have addressed the uncontroverted scheduling needs of Defendant's sole witness. Under the circumstances of this case, the trial court abused its discretion in denying Defendant's motion for a continuance based on the temporary unavailability of M.L. as a witness due to M.L. going into labor on the morning of trial. In addition, Defendant was prejudiced as a result of the denial of her motion. Therefore, the trial court committed reversible error in denying Defendant's motion for a continuance. *Salter*, 250 S.W.3d at 712. Point granted.

## III.     CONCLUSION

The judgment of the trial court is reversed and the case is remanded for a new trial.

_____
ROBERT M. CLAYTON III, JUDGE

Patricia L. Cohen, P.J., and
Roy L. Richter, J., concur.